In the Matter of the Accounting of LISA P. SCHNEIDER, as Administratrix of the Estate of CHICO H. SCHNEIDER, Deceased.

Surrogate's Court, New York County, April 10, 1950, on reargument, October 6, 1950.

*Cornelius J. Smyth* and *Saul A. Finkel* for administratrix, petitioner.

*Joseph Solomon,* special guardian for Roque Schneider, an infant, respondent.

*L. Arnold Weissberger* for Rita A. Mahool, respondent.

*Harold H. Corbin, Stuart Sprague, Francis B. Delehanty, Jr., Bernard K. Rothenberg* and *Joseph Solomon* for Winifred Revill, respondent.

*Albert W. Epstein, William S. Shea, David J. Levy* and *Joseph Spanier* for Botho C. Schneider and another, respondents.

*McCormick, McCormick & Dunne* for Continental Casualty Co., respondent.

*Hamilton McInnes* for State Tax Commission, respondent.

*Francis A. O'Neill,* special guardian for Nicholas Schneider, an infant, respondent, on original argument.

*Albert W. Epstein,* special guardian for Nicholas Schneider, an infant, respondent, on reargument.

FRANKENTHALER, S. This case presents a novel question in this State in the realm of the conflict of laws. Deceased, a naturalized American citizen of Swiss origin died domiciled in New York County, leaving as an asset of his estate certain real property located in Switzerland. In his will he attempted to dispose of his property, including the parcel of Swiss realty, in a manner which is said to be contrary to the provisions of Swiss internal law. That law confers upon one's legitimate heirs, a so-called *legitime,* i.e., a right to specified fractions of a decedent's property, which right cannot be divested by testamentary act. The precise issue, therefore, is whether this deceased had the power to dispose of the realty in the manner here attempted.

Ordinarily, the courts of a country not the situs of an immovable are without jurisdiction to adjudicate questions pertaining to the ownership of that property (*Knox* v. *Jones,* 47 N. Y. 389; *Matter of Osborn,* 151 Misc. 52; *Deschamps* v. *Miller* [1908] 1 Ch. 856; *British South Africa Co.* v. *Companhia de Mocambique* [1893] A. C. 602). Actions concerning realty are properly litigable only before the courts of the situs. However, in this case the administratrix appointed prior to the probate of the

will has liquidated the foreign realty and transmitted the proceeds to this State. She is now accounting for the assets of the estate including the fund representing that realty. As a consequence, this court is called upon to direct the administration and distribution of the substituted fund and to determine the property rights therein (*Butler* v. *Green,* 65 Hun 99; *Matter of Mackay,* 77 Misc. 303; *Matter of Peat,* L. R. 7 Eq. 302; *Deschamps* v. *Miller, supra*). In doing so, however, reference must be made to the law of the situs, as the question of whether the fund shall be distributed to the devisee of the realty under the terms of the will is dependent upon the validity of the original devise thereof (*Butler* v. *Green, supra; Matter of Mackay, supra*), which must be determined under the law of the situs of the land itself (*Monypeny* v. *Monypeny,* 202 N. Y. 90; *Matter of del Drago,* 287 N. Y. 61).

The court is confronted at the outset with a preliminary question as to the meaning of the term " law of the situs " — whether it means only the internal or municipal law of the country in which the property is situated or whether it also includes the conflict of laws rules to which the courts of that jurisdiction would resort in making the same determination. If the latter is the proper construction to be placed upon that term, then this court must, in effect, place itself in the position of the foreign court and decide the matter as would that court in an identical case.

The meaning of the term " law of the situs " can be ascertained best from a consideration of the reasons underlying the existence of the rule which requires the application thereof. The primary reason for its existence lies in the fact that the lawmaking and law-enforcing agencies of the country in which land is situated have exclusive control over such land (*Watts* v. *Waddle,* 6 Pet. [U. S.] 389; *Polson* v. *Stewart,* 167 Mass. 211; 1 Wharton on Conflict of Laws [3d ed.], §§ 276b, 278). As only the courts of that country are ultimately capable of rendering enforcible judgments affecting the land, the legislative authorities thereof have the exclusive power to promulgate the law which shall regulate its ownership and transfer. When the land itself formed the estate asset upon which the will was intended to operate, the power of sovereign to enforce such laws created rights therein between the parties in interest. If an instrument which was intended to transfer that land did not meet the standards set by that law or violated some provisions thereof regarding the land, the courts had the physical power to deny it effect and enforce instead the rights decreed by the law of that country

or the law of any other country which the lawmaking agencies deemed appropriate in a particular case.

Hence, the rights which were created in that land are those which existed under the whole law of the situs and as would be enforced by those courts which normally would possess exclusive judicial jurisdiction (Griswold, *Renvoi* Revisited, 51 Harv. L. Rev. 1165, 1186; cf. Schreiber, The Doctrine of *Renvoi* in Anglo-American Law, 31 Harv. L. Rev. 523, 559). If another court, in this case our own, is thrust into a position where it is obliged to adjudicate the same questions concerning title to that land, or a substitute therefor, it should be guided by the methods which would be employed in the country of situs. The purely fortuitous transfer of the problem to the courts of another State by virtue of a post-mortuary conversion of the land, effected for the purpose of administering the entire estate in the country of domicile, ought not to alter the character of the legal relations which existed with respect to the land at the date of death and which continued to exist until its sale. Consequently, this court, in making a determination of ownership, must ascertain the body of local law to which the courts of the situs would refer if the matter were brought before them.

It has been urged, however, that a reference to the conflict of laws rules of the situs may involve an application of the principle of *renvoi,* and if so it would place the court in a perpetually-enclosed circle from which it could never emerge and that it would never find a suitable body of substantive rules to apply to the particular case (see Schreiber, *op. cit. supra; Matter of Chadwick,* 109 Misc. 696, and authorities cited). This objection is based upon the assumption that if the forum must look to the whole law of the situs, and that law refers the matter to the law of domicile, this latter reference must be considered to be the whole law of the latter country also, which would refer the matter back to the law of the situs, which process would continue without end. That reasoning is based upon a false premise, for as has been said by Dean Griswold (Renvoi Revisited, *op. cit. supra,* p. 1190) : " Recognition of the foreign conflict of laws rule will not lead us into an endless chain of references if it is clear for any reason that the particular foreign conflicts rule (or any rule along the line of reference) is one which refers to the internal law alone  *  *  *." (To the same effect, see *Casdagli* v. *Casdagli* [1919], A. C. 145, revg. [1918], Prob. 89, opinion of Scrutton, J., dissenting, p. 111; Cowan, *Renvoi* Does Not Involve a Logical Fallacy, 87 U. of Pa. L. Rev. 34.)

The precise question here considered, namely whether there shall be a reference to the entire law of the situs to determine the ownership of the proceeds of foreign realty, is one of first impression in this State. Nevertheless, the above stated principles, together with the rule enunciated in the Restatement of the Conflict of Laws, in the English authorities on the subject and in analagous cases in courts of this State and others, require us to accept it as a part of our law and to hold that a reference to the law of the situs necessarily entails a reference to the whole law of that country, including its conflict of laws rules.

The rule as formulated in the Restatement is as follows: " § 8. *Rule in questions of title to land or divorce.* (1) All questions of title to land are decided in accordance with the law of the state where the land is, including the Conflict of Laws rules of that state. (2) All questions concerning the validity of a decree of divorce are decided in accordance with the law of the domicile of the parties, including the Conflict of Laws rules of that state." In all other cases the Restatement rejects the *renvoi* principle and provides that where a reference is made to foreign law that law should be held to mean only the internal law of the foreign country (Restatement, § 7; cf. note, A Distinction in the *Renvoi* Doctrine, 35 Harv. L. Rev. 454).

The English rule as to *renvoi* in the field of immovables has been established and defined in two leading decisions (*Matter of Baines,* unreported, stated in Dicey on Conflict of Laws [5th ed.], p. 877 and *Matter of Ross* [1930], 1 Ch. 377; see, also, *Matter of Askew* [1930], 2 Ch. 259). In both cases the English courts were confronted with the precise question here involved. In the *Baines* case (*supra*) the decedent, an English national died leaving land in Egypt which was sold subsequent to his death and the proceeds transmitted to England. The will, although valid under English law, would have been invalid under the local law of Egypt. However, under the Egyptian conflict of law rules the succession to land is governed by the internal law of the country of which the decedent was a national. Accordingly, the will was upheld.

Similarly, in the *Ross* case (*supra*) a question arose concerning title to an Italian estate which the testatrix had owned at her death. A claim was made by her son, similar to that interposed in this case, that he was entitled to a " legitima portio " under local Italian law, which right, it was asserted, should attach to the proceeds of a sale of the land. In answer to this

contention, the court declared (p. 405) that the " lex situs must
* * * be construed in the way the Courts of the country
where the immovables are situate would themselves determine.
On this basis, the expert evidence is clear that the Italian Courts
would decide the succession to the immovable property in the
same manner as the English Court would determine it if the
immovable property in question belonged to an Englishman
and was situate in England." In both of these cases, the courts
employed the law which would have been enforced in the courts
of the situs (cf. *Kotia* v. *Nahas* [1941], 3 All E. R. 20; *Ross* v.
*Ross,* 25 Can. Sup. Ct. 307).

The decisions in this State also indicate the applicability of
the doctrine of *renvoi* in this field. In the early case of *Dupuy*
v. *Wurtz* (53 N. Y. 556), which involved personal property,
there appears the first reference to the doctrine. The court
there said, by way of dictum, at page 573: " When we speak of
the law of domicil as applied to the law of succession, we mean
not the general law, but the law which the country of the domicil
applies to the particular case under consideration (*Maltass* v.
*Maltass,* 1 Rob. Ecc. R. 72, per Dr. LUSHINGTON)." If the word
" situs " is substituted therein for " domicil " the language
becomes appropriate to a case involving real property.

The implications of that dictum were disregarded in the cele-
brated *Matter of Chadwick* (109 Misc. 696, *supra,* Surr. Ct.,
N. Y. County, per WINTHROP, Ref.), where the Referee, reject-
ing the *renvoi* principle completely, asserted (p. 711) that it " is
no part of New York law." However, fifteen years prior to
that case the Supreme Court in this county rendered a decision
in which the principle was utilized and in which it formed the
basis for the result reached (*Holmes* v. *Hengen,* 41 Misc. 521).
The case was affirmed without opinion by the Appellate Divi-
sion in this department (94 App. Div. 619). A similar result
was reached in *Ross* v. *Graham* (122 Misc. 574). (See, also,
*Guernsey* v. *Imperial Bank of Canada,* 188 F. 300.)

The application of foreign conflict of laws rules has found
further expression in two more recent decisions by the Court of
Appeals, both of which involved the validity of decrees of
divorce (*Ball* v. *Cross,* 231 N. Y. 329; *Dean* v. *Dean,* 241 N. Y.
240). The law of this State is thus in agreement with the
principle stated in subdivision (2) of section 8 of the Restate-
ment, quoted above.

The broad assertion in *Matter of Chadwick* (*supra*) that the
*renvoi* principle is not applicable in New York is not in accord

with the earlier or later cases. The precise limits of its applicability are as yet undefined (cf. 1 Rabel on Conflict of Laws: A Comparative Study, pp. 71 *et seq.*). It may be that in some fields the underlying policies of our law will require its rejection and a direct reference to foreign internal law. Thus far it has been found applicable in the realm of divorce (*Ball* v. *Cross, supra; Dean* v. *Dean, supra*), and in the use of foreign borrowing statutes (*Holmes* v. *Hengen, supra*). Other States have applied it to sustain the validity of a marriage (*Lando* v. *Lando,* 112 Minn. 257), to determine the rule for distribution of the proceeds of a wrongful death action (*Hartley* v. *Hartley,* 71 Kan. 691), to decide the applicability of foreign exemption statutes (*Faris* v. *Tennant,* 194 Ind. 506) and to determine the capacity of a party to enter into contractual relations (*University of Chicago* v. *Dater,* 277 Mich. 658). The rule of the Restatement (§ 8, subd. [1]) and the English decisions, as well as the persuasive analogy of the above cases require the court to hold it equally applicable to the question presented in this case, i.e., to the determination of title to a fund representing foreign immovables.

Thus it is now necessary to ascertain the whole of the applicable Swiss law and apply it to this case. However, the court's attention has been first called to the Swiss-American Treaty of 1850 (proclaimed Nov. 9, 1855; 2 Malloy Treaties, p. 1763), and particularly to articles V and VI thereof. From a reading of those articles, the court concludes that the said treaty does not require a different procedure or reference than that heretofore outlined, and does not itself provide a basis for determining the descent and distribution of the property here involved.

The major purpose underlying the enactment of article V was to define the *capacity* and the *power* of citizens of each nation to deal with property located within the borders of the other country (*Hauenstein* v. *Lynham,* 100 U. S. 483; *Jost* v. *Jost,* 1 Mackey [12 D. C.] 487; *Lehman* v. *State,* 45 Ind. App. 330). It was designed primarily to remove some of the restrictions imposed by the local States and cantons upon ownership of property by aliens. To that end, article V provides that with respect to personalty, a citizen of the other contracting nation shall have the power to receive, hold and dispose of such property. Concerning realty, the treaty declares that citizens of the other country who may, by virtue of State or cantonal law, be incapable as aliens of *holding* such property, shall have the lesser right to *receive* and *dispose* of such property within such

period of time as the States or cantons may by law provide, and to retain the proceeds. Clearly, that portion of the treaty is merely enabling in nature, conferring initial power to deal with property interests and removing the more onerous restrictions on property ownership imposed by local laws.

Article VI of the treaty provides that: "Any controversy that may arise among the claimants to the same succession, as to whom the property shall belong, shall be decided according to the laws and by the judges of the country in which the property is situated." Insofar as that article attempts to define the jurisdiction of the several courts and refers to the question of applicable law, it is a generalized declaration of existing principles. It represents a crystallization of extant rules of private international law and protects them from arbitrary unilateral alteration by providing a formal statement of those principles. It is apparent that nothing contained in the text of that article prevents either of the signatory nations or States thereof from formulating its own rules of internal law *and* of conflict of laws. The treaty merely directs, as does the common law of this State, that initially a reference must be made to the laws of the situs. But the conflict of laws rules and the rules concerning the rights and privileges of foreign nationals and domiciliaries are as much a part of the " laws " of the situs as are its internal laws, as noted above.

Concerning the actual content of Swiss law, the expert witnesses summoned by the respective parties are in agreement that the Swiss internal law would apply to the real and personal estate of a Swiss citizen domiciled in Switzerland, and that the laws of the country of domicile would, under the Swiss theory of unity of succession, apply to all of the Swiss property belonging to a foreign national.

The experts disagreed, however, upon the ultimate question in this case, i.e., the Swiss rule applicable to the distribution of the Swiss realty of a person of *hybrid* nationality domiciled not in Switzerland but in the country of his second citizenship. Under Swiss law the decedent herein was vested with dual nationality. The law of that country provides that a citizen, in order to divest himself of the cloak of citizenship must formally renounce his allegiance in the manner prescribed by statute. Such formal act of renunciation was not performed by the decedent. The assumption of a new allegiance by naturalization in the United States did not of itself suffice to free him of fealty to Switzerland. In such event, he became a

person of twin or dual citizenship, a status which is recognized under Swiss law (see e.g., *Matter of Community of Feldis*, 24 B. E. [1] 312 [Switz.█].

The court has carefully examined the authorities and materials submitted by the experts and has formed its conclusion upon the basis of those authorities. None of the cases submitted involved the precise facts here presented. They rather present guides, signs and close analogies. From these indicia, however, the court concludes that the Swiss law would refer a matter such as this to the New York internal law, under which law the will is a valid disposition of the testator's property. The testamentary power of this decedent would not be curtailed by the *legitime*.

The language in the Swiss cases, most of which pertain only to the question of the jurisdiction of courts, indicated that the place in which " property is situated ", as referred to in the treaty, means, in the case of foreign domiciliaries, the country of domicile, upon the Swiss legal fiction that a decedent's entire estate follows his person and is located at his domicile. Such a rule amounts to a statement that the place of *actual* location of property (Switzerland) refers all questions to the law of the place of *presumed* location, i.e., the country of domicile. The Swiss courts treat the reference to its own law as a reference to its own conflict of law rules and policies concerning the devolution of estates of foreigners.

In the case of one who is of both Swiss and American nationality, but who is not a Swiss domiciliary, it appears that the same rule applies; domicile is controlling and its laws provide the substantive rules of decision.

The case of *Matter of Wohlwend* (9 B. E. 507) also involved a hybrid citizen. The court there said: " It would be entirely incompatible with this if [Switzerland] would apply to the succession of a citizen who died in the other contracting state * * * simply its own laws governing jurisdiction and its controlling substantive law. Therefore, although it may be true that in the case under consideration here the decedent was at the time of his death still a Swiss citizen this does not change the applicability of the provisions of the Treaty * * *. In accordance with the text of this provision, it *might* now appear that the Treaty forthwith and in general, and especially without

distinguishing between personal and real property, intended to declare the jurisdiction and the substantive law of the place where the estate is located as controlling for the succession * * * . However, the said interpretation of the Treaty is in clear conflict with the interpretation given by the Swiss Federal Council at the execution of the Treaty with regard to the meaning intended * * * ''. The Treaty must have intended to '' ' designate the courts and the laws of the country in which the estate devolved, if in general it is also located wherever the property or the greater part of same is located and this in such a manner that the decision to be rendered by these courts refers to all the property forming the estate, irrespective of the land in which it is located '. * * * On the part of Switzerland by the ' place where the property is located ' there was understood the last domicile of the decedent, which, however, it is true can also be designated as the place of the location of the estate — considering the latter as one unit.'' (The quoted language is from a translation of the opinion in the above case, submitted by the parties.)

According to that opinion, the Swiss authorities regard the estate as a unit, and, without distinguishing between realty and personalty understand the words '' place where the property is located '' to mean the last domicile of the decedent. '' The Treaty, the Tribunal held, was applicable as the claimant's domicile was in Switzerland and the decedent's in the United States; it did not matter that all of the parties were of Swiss nationality * * *. Relying on the Message of 1850, the Tribunal did not distinguish between movables and immovables.'' (Nussbaum, American-Swiss Private International Law, 47 Col. L. Rev. 186, 196.)

A second case in which the Swiss law was expounded is *Matter of Community of Feldis (supra)*. In that case, however, a dual citizen died domiciled in Switzerland. The court, holding that it had jurisdiction over Swiss realty belonging to the decedent, observed that '' it has been proven that Barandun returned to Switzerland in the year of 1889, took up his domicile there and died there also. Therefore, this (the present case) concerns the succession to an estate of a Swiss citizen who was domiciled in Switzerland, and who *therefore* has to be treated exclusively as a Swiss citizen, as expressly stated already by the Federal Tribunal in its judgment of October 9, 1886, in re Loosli, Official Collection Vol. XII, page 512, Considerations 1 * * *. Barandun has been, as already stated, in

Switzerland not as a foreigner, but as a Swiss citizen ''. (Emphasis supplied.)

Although the question of the applicable law was left open it appears from the language employed that, as in the *Wohlwend* case (*supra*), the court was of the opinion that in the case of a hybrid citizen, the place of domicile is controlling in determining the proper jurisdiction and the applicable law.

For this reason it is apparent that article 28 of the Swiss Federal Law, referred to by one of the parties, is inapplicable. In view of the language in the two cases above, it must be that that statute is applicable only to a pure Swiss citizen who dies domiciled in an alien country.

Consequently, the court holds that the testamentary plan envisaged by the testator and set out in his will is valid, even in its application to the Swiss realty. The proceeds of that realty must therefore be distributed pursuant to the directions contained in the will.

The account here in the process of settlement was rendered by an administratrix appointed prior to the admission of the will to probate. Several objections in addition to the one disposed of above have been filed and must now be considered.

The first of those objections relates to the costs allowed in the original proceeding for the appointment of a representative. The authority of the accounting party to administer the estate was revoked by a direction of the appellate courts to admit the will to probate (273 App. Div. 761, affd. 298 N. Y. 532, motion for reargument denied 298 N. Y. 634) and by the issuance of letters testamentary pursuant to that direction. The objectants, including the executrix, seek to recover the costs allowed to the administratrix by this court at the termination of the trial and prior to the appeal. The court holds that the costs must be refunded '' since the right to them depended upon a judgment no longer in effect '' (*Matter of Miller*, N. Y. L. J., Dec. 22, 1948, p. 1626, col. 2, citing *Rozell* v. *Andrews*, 43 Hun 638, opinion in 6 N. Y. St. Rep. 730; *Matter of Goebel*, 272 App. Div. 146; 2 Carmody on New York Practice, p. 27, and Civ. Prac. Act, § 587).

However, with respect to the costs paid by the removed administratrix to the other initially successful parties, the court holds that the payment of such costs does not constitute a basis for surcharging her. Under the terms of the decree, prior to its reversal, she was required to make these payments, and they were made pursuant thereto. Recovery of such funds must be sought from the parties to whom they were awarded.

Objection has been made to the credit taken by the administratrix for rental payments made by her for an apartment held under lease by the decedent, but which she occupied individually subsequent to his death. That credit is disallowed and the objection thereto sustained. The estate was under no duty to provide her with quarters after the death of decedent nor did she have the right to remain in possession of the apartment and charge the estate with the cost thereof (cf. *Matter of Limberg,* 281 N. Y. 463). Nor does a right of quarantine under section 204 of the Real Property Law, attach to leasehold property (*Matter of Sobel,* 175 Misc. 171). However, as decedent's lawful widow she is entitled to the sum of $300 under section 200 of the Surrogate's Court Act. She may set off that sum against the rental payments to be refunded (Surrogate's Ct. Act, § 267).

An attempt is also made to surcharge the accountant for failure to earn interest on the cash principal of the estate, which the administratrix held in a checking account. The objectants seek to hold the fiduciary accountable for failure to earn at least savings bank interest on the average balance on hand. However, the circumstances of this case do not afford a basis upon which to direct such a surcharge. The administratrix was under a duty to collect the assets and to have them available for payment of claims and for distribution. The fact that an appeal was taken from the decree granting letters of administration did not make it certain that the administration itself would be delayed for any serious length of time beyond the usual period (*Matter of Lyons,* 186 App. Div. 161, 167, affd. 227 N. Y. 564; *Matter of Kruger,* 139 Misc. 907). The failure of the administratrix to earn interest was not such an abuse of the reasonable discretion vested in her as to warrant a surcharge (*Matter of Burroughs,* 155 Misc. 237).

The objectants have also questioned the formula employed in computing commissions. The court holds that the administratrix is entitled to one-half commissions for receiving the estate assets but none for the contemplated transfer of those assets to the executrix (cf. *Matter of Staiger,* 249 N. Y. 229). Such transfer by an administrator to a representative in succession, appointed after the probate of the will, does not constitute a paying-out of the assets within the meaning of the statute (*Matter of Hurst,* 111 App. Div. 460). The "rule respecting the calculation of commissions on property is limited to the distribution thereof to its equitable owners, and has no application to the transfer of the estate to an officer charged

with its future administration " (*Matter of Ingraham*, 60 Misc. 44, 49).

In addition to her commissions, the administratrix seeks extra compensation for her time spent and services performed in Europe in attending to estate affairs. She also requests reimbursement for maintenance and traveling expenses incurred by her in relation to those matters, and more particularly in attending to the collection of estate assets located in Switzerland.

It is well settled that the statutory commissions constitute the only compensation allowable to a fiduciary for the performance of the duties of his office. Additional compensation cannot be awarded out of the estate except for services entirely beyond the scope of those duties (*Matter of Froelich*, 122 App. Div. 440, affd. 192 N. Y. 566; *Matter of Popp*, 123 App. Div. 2; *Matter of Edelmuth*, 73 N. Y. S. 2d 886).

However, necessary expenses incurred in the performance of estate functions may be allowed (Surrogate's Ct. Act, § 285). The fiduciary was not required to employ her own funds to pay costs necessary to the administration of the estate. Reasonable expenses incurred by her for travel and maintenance may be charged to the estate (*Matter of Rohr*, 145 Misc. 382; *Matter of O'Byrne*, 65 N. Y. S. 2d 417; *Everts* v. *Everts*, 62 Barb. 577).

The extra compensation is, therefore, denied. The amount of expenses claimed by petitioner is exorbitant and without reasonable support in the record. Petitioner has failed to establish that the trip abroad was undertaken for other than her own personal reasons or that such an expense was reasonably necessary. It is evident, however, that while there she incurred additional expense in rendering services that were reasonably necessary for the administration of the estate. The amount of such expenses is fixed and allowed in the sum of $350.

All other objections have been withdrawn except that relating to the fee to be allowed to the attorney for the administratrix. The amount of his compensation is fixed at $5,000.

Submit, on notice, decree settling the account accordingly.

(On reargument, October 6, 1950.)

This application for reargument by the special guardian for one of the infant parties is granted. Upon reargument, the court adheres to its original decision.

The only question raised by the moving party concerns the construction of one of the Swiss cases submitted at the hearing. It is contended that the decision of the Swiss court in *Matter of Community of Feldis* (24 B. E. [1] 312) requires this court to

apply Swiss internal law in decreeing distribution of the proceeds of the Swiss realty here involved, although it is conceded that under general rules applied by the courts of Switzerland, the law of the domicile (in this case New York) would control the descent and distribution of Swiss real estate (*Matter of Wohlwend,* 9 B. E. 507). In the *Feldis* case (*supra*) which was discussed in detail in the principal decision, a Swiss domiciliary died leaving a Swiss estate as well as real property situated in New York. The court held that it had neither jurisdiction over such property nor the power to apply Swiss internal law to determine its ownership, although under its own jurisprudence the law of the domicile is deemed the most appropriate to apply in making such a determination. That issue was left for the determination of the courts of this State according to the laws thereof (see *Matter of Barandon,* 41 Misc. 380).

It does not follow from that decision, however, as is contended by the special guardian, that the Swiss court would apply Swiss law to determine the ownership of *Swiss* real property merely because it recognized that such procedure would be followed by the New York courts in the case of New York property and that it could not interfere with that procedure. Although Switzerland may lack the power to impose its fundamental policy upon a foreign country when the latter is the situs and require it to employ Swiss law in adjudicating the question of ownership, it is free to prescribe that it will itself refer to a foreign system of law when it alone is the situs. The Swiss rule that both personalty and realty descend by the law of the domicile is clearly a rule employed by Swiss courts in the case of assets having a situs within that country, when those courts are ordinarily the sole arbiter of the question of ownership. As this court has determined to be guided by the whole of the Swiss law in order that the decree herein might conform as nearly as possible to that which a Swiss court would have rendered under the circumstances, and not to some truncated version of that law, it is clear that the proceeds of the Swiss realty must be distributed in accordance with the law to which the Swiss courts would resort, which in this case is the internal law of New York. Under that law, no impediment existed to the disposition prescribed by the terms of the will. The proceeds will be distributed to the beneficiaries named therein.

Submit, on notice, order accordingly.

HALLINAN, J. Defendants move to dismiss the three causes of action alleged in the complaint on the ground that each of them is legally insufficient.