In the Matter of the Estate of ARDE BULOVA, Deceased. EMILY B. HENSHEL et al., as Executrices of ARDE BULOVA, Deceased, et al., Respondents; ILEANA M. K. BULOVA, Appellant.

First Department, October 24, 1961.

*Sol A. Rosenblatt* (*Charles Roden* and *Richard L. Russell* with him on the brief), attorney for appellant.

*Simon Rose* of counsel (*Louis Nizer, Julius S. Chase* and *Albert F. Smith* with him on the brief; *Phillips, Nizer, Benjamin, Krim & Ballon*, attorneys), for executrices, respondents.

*Sulzberger & Sulzberger* for Harry B. Henshel, respondent.

*David M. Berger* (*Edward Edelman* with him on the brief), special guardian for infants, respondents.

BREITEL, J. P.  A widow appeals from a decree in Surrogate's Court, granted on cross motions for summary judgment under

rule 113 of· the Rules of Civil Practice. It was held that she had, in the lifetime of decedent, validly waived her right of election as a surviving spouse under section 18 of the Decedent Estate Law. Hence, it was also concluded that her attempted exercise of a right of election was of no effect.

Decedent died in California in 1958. Under his will his widow was bequeathed $25,000, in an estate valued in many millions of dollars. Involved is a 1956 instrument purporting to waive the widow's right of election. It was executed by the widow in Switzerland before an American consular official in the form required by the New York statute. The widow argues that there was fraud in the inducement, raising an issue of fact which cannot be resolved on affidavits alone, and that the instrument was not validly executed in accordance with the law of the place of execution, Switzerland.

On both issues, the widow's position is not tenable, and the Surrogate's disposition, therefore, should be affirmed in all respects.

Decedent, Arde Bulova, was a wealthy man, associated with the well-known watch manufacturing company bearing his name. In 1952 Bulova, at the age of 65, married in the State of New Jersey a woman much younger than himself. They had met that year in Switzerland, where, incidentally, Bulova had substantial assets. His new wife was a Rumanian national, resident in Switzerland. He, at the time, was domiciled in New York, and was, presumably, a United States citizen. In the same year, after the marriage, the wife became an American citizen. Since then, although decedent and his wife travelled afar and sojourned in Switzerland for extended periods, the couple were domiciled in New York.

Before the marriage, in New Jersey, the enamored couple entered into a strange antenuptial agreement. It provided, among other things, for the wife to receive $25,000 as a fund to finance a divorce or separation action, should one ever be brought between the parties. It also contained reciprocal waivers by the prospective spouses of any rights of election in each other's estate. It suffices that none now defends the agreement as valid and enforcible.

Thus launched, the marriage ensued a very troubled course. There were alternating periods of accord and discord. Standing clear during these periods are the precipitating facts: the antenuptial agreement was of doubtful validity, a matter of continuing irritation; and Bulova became ill, and was later to be diagnosed to have and die of cancer. In Switzerland in December, 1956 the parties were living together, more or less in

accord. But, notably, each was being advised by separate and distinguished counsel on such matters as to which there was a lack of accord.

In that same month, the agreement in suit was executed by both husband and wife before the United States Vice-Consul in Zurich. It is dated December 7, 1956 and the acknowledgments, as required by New York statute law, were certified to have been taken on December 26, 1956 (Decedent Estate Law, § 18; Real Property Law, § 301).

The agreement provided for payment of $200,000 to the wife, creation of a trust fund of $400,000 for her lifetime benefit with power to dispose of the remainder, and for a testamentary bequest of $25,000. It was also provided that the wife waived and released all rights in her husband's estate under New York law or that of any other jurisdiction. The husband also waived any rights in the wife's estate. The agreement recited that the wife had property of her own, and that she knew the husband was worth between 10 and 15 million dollars. It also recited that the parties hoped to settle their differences and "thereby insure that they will live together in harmony and in trust in all respects".

It is with respect to this last recital that the widow contends there was fraud in the inducement. She asserts that decedent husband never intended that the parties should continue to live together, but the agreement, as well as a defaulted promise to buy her a $400,000 home in France, were lures to induce her signature to the waiver of her rights. To support this contention she supplies the affidavit of a business associate of the husband who deposed that (1) Bulova was increasingly annoyed with his wife's refusal to sign a new waiver agreement, (2) he told the associate that he was considering living separate and apart from his wife, (3) he was getting too old to live compatibly with a young wife, (4) he said "As long as I support her, she can't get anything more out of me or my estate", and (5) his lawyer had advised that an ideal solution would be a divorce and not to take any chance that she would try to create trouble for his estate or the watch company.

None of these assertions by Bulova's business associate is inconsistent with an intention in Bulova in December, 1956 to effect a genuine harmony with his wife. They merely show that passion did not deprive him of all acumen, and that his lawyer was more pessimistic than he. Even before the 1952 marriage it was evident that the parties viewed the marriage as a hazardous venture. Four years of marriage had not lessened the evident hazard of failure. Bulova's reflections to his associate —

as, indeed, the 1956 agreement itself — only show that another effort, although not certain of success, might be worth the try.

Moreover, the widow's own affidavit destroys the very inference upon which her contention of fraud is based. She says that in September, 1957, nine months after execution of the agreement, Bulova illustrated his abiding "strong love" by his birthday note to her:

"Happy Birthday Baby — If you will try to be considerate of me perhaps by your next birthday I'll be well and buy you anything you want.

> "Love and kisses
> "Arde".

Truly, this is not the note of one who seeks to destroy a marital relationship, but of one who still struggles, almost pitifully, to maintain the marriage, even by purchase, if necessary. Hence, even the unsupported notion of fraud is contradicted by the widow's own proof, for it is in her affidavit that the note is set forth.[*]

In consequence, the matter is determinable on the affidavits, as a matter of law, and there is no issue of fact requiring a hearing.

The widow's other significant contention is that the 1956 agreement is invalid because its execution does not conform to the formalities required by Swiss law. She asserts, without contradiction, that under Swiss law (Swiss Civ. Code, § 512) a postnuptial agreement to be valid must be signed by two witnesses, approved by a public officer, and filed with him. This, of course, was not done here. She also emphasizes that under Swiss law the wife is entitled to forced heirship in a share of her husband's property (Swiss Civ. Code, § 462). Moreover, when Bulova died, the widow says, he possessed real property in Switzerland of the value of two million dollars. Because of the Swiss situs of execution and the additional significant Swiss contacts, she argues that the instrument was never validly executed.

It is often generalized with respect to contracts that the law of the place of contracting determines the formalities required for making a contract (e.g., *Auten* v. *Auten*, 308 N. Y. 155, 160; Restatement, Conflict of Laws, § 334; Goodrich, Conflict of Laws [3d ed.], pp. 316–320). Nevertheless, the generalization is quite

---

[*] This note was written after Bulova was in terminal illness following an operation for cancer in June, 1957. It was a month later (October, 1957) that the parties sustained their last rupture. Shortly thereafter, the husband started a divorce action, during the pendency of which he died.

incomplete, especially if the contract includes such jural relations as conveyances, elections, releases or waivers.

Thus, it is just about universally true that formalities required of a conveyance of an interest in land are determined by the law of the place where the land is (Restatement, Conflict of Laws, § 217; Goodrich, *op. cit.,* p. 453). The same is also largely true of instruments affecting the intestate and testamentary succession of interests in land (Restatement, Conflict of Laws, §§ 245, 249; Goodrich, *op. cit.,* pp. 500, 505). In the same vein, with respect to the conveyance of chattels generally the law of the situs of movables determines the necessary formalities of execution (Restatement, Conflict of Laws, § 256; Goodrich, *op cit.,* pp. 470–472). On the other hand, the intestate and testamentary succession to chattels (including formalities of execution of instruments affecting such testamentary succession) is determined by the law of the decedent owner's domicile (Restatement, Conflict of Laws, §§ 300, 303, 306; Goodrich, *op. cit.,* pp. 501–505, 512–514).

New York law is quite in accord with the rules above specified.* Indeed, as to decedent estates the New York statutes in large measure so provide explicitly (Decedent Estate Law, § 47).

Coming a little closer to the problem at hand, it is generally the rule that a widow's rights to chattels or to real property will be determined by the law of the domicile of decedent in the one case, and by the law of situs of the land in the other (e.g., *Flatauer* v. *Loser,* 156 App. Div. 591, revd. on other grounds 211 N. Y. 15; *Roessle* v. *Roessle,* 163 App. Div. 344, 350; *Matter of Sahadi,* 30 Misc 2d 166 [Frankenthaler, S.], affd. 283 App. Div. 1012; *Matter of Bleicher,* 142 Misc. 549, 550 [Foley, S.]; Restatement, Conflict of Laws, §§ 238, 253, 301; Goodrich, *op. cit.,* pp. 376–394). But, a widow's election with respect to dower, made in accordance with the law where the land is, binds her everywhere, and the same is true as to antenuptial contracts affecting land interests (Restatement, Conflict of Laws, § 253, *Comment b,* § 238, *Comments a, b;* Goodrich, *op. cit.,* pp. 390–392; Conflict of Laws — Election by Legatee, Ann. 105 A. L. R. 271, 280–284; cf. *Roessle* v. *Roessle, supra*).

---

* As to conveyances of land generally, see *Matter of Del Drago* (287 N. Y. 61, 74, revd. on other grounds 317 U. S. 95). As to intestate and testamentary disposition of land, see 14 N. Y. Jur., Decedents' Estates, § 13; *Matter of Good,* 304 N. Y. 110, 114-115. As to chattel conveyances, see *Weissman* v. *Banque De Bruxelles,* 254 N. Y. 488, 491–494; *Hutchison* v. *Ross,* 262 N. Y. 381, 389–395; cf. *Guillandar* v. *Howell,* 35 N. Y. 657. As to succession to chattels, see 14 N. Y. Jur., Decedents' Estates, § 13; *Chamberlain* v. *Chamberlain,* 43 N. Y. 424, 432–433; *Matter of Slade,* 154 Misc. 275, 276.

. While none of the rules specified in this discussion covers precisely the question where a release and waiver of a spouse's statutory interest in a decedent's estate (as distinguished from dower — a present interest in a spouse's property) is involved, the parallels are quite obvious (see *Matter of Shack,* 207 Misc. 953, applying the law of the domicile [New York] to the execution and effect of a waiver of a right of election executed in California). It would certainly seem that, with respect to the Swiss land owned by decedent at the time of his death, the validity of the execution of the 1956 agreement as well as its effect is determined by Swiss law (see *Matter of Ellis,* 30 Misc 2d 225), holding that a New York right of election did not extend to real property in New Jersey. In this respect then it is not for the New York courts to determine or announce that the widow has or has no interest in any part of the decedent's estate which consists of land in Switzerland. On the other hand, it would seem just as clearly that Swiss law is generally not concerned with the devolution of any assets located outside of Switzerland, not owned by its nationals or domiciliaries, but New York (as the State of domicile) is wholly concerned with such devolution. Almost as clearly it would seem that Swiss law would respect the law of Bulova's domicile with respect to the devolution of any movables located in Switzerland at the time of decedent's death (cf. *Matter of Schneider,* 198 Misc. 1017, 1025–1028 [FRANKENTHALER, S.]). In any event, even if the Swiss law were perchance to the contrary, New York law might be expected to require application of its own internal law with regard to such movables.

Since the 1956 agreement was more than merely a contract but also affected jural relations in the conveyance or devolution of property, the formalities for its execution were not exclusively or properly the concern of Swiss law (see 14 N. Y. Jur., Decedents' Estates, § 208). This court and the Court of Appeals have had occasion before to determine that the mere fact an instrument is a contract does not mean that the conflict rules to be applied are those associated with contract but, rather, may be and would most likely be those associated with the jural relations directly affected by provisions of the agreement (*Rubin* v. *Irving Trust Co.,* 280 App. Div. 348 [VAN VOORHIS, J.], affd. 305 N. Y. 288, especially 298–300; cf. *Reilly* v. *Steinhart,* 217 N. Y. 549 [CARDOZO, J.], giving recognition to the fact that a contract may have constituent elements invoking diverse rules in conflict of laws and the Statute of Frauds). Hence, it is one or more of the specialized rules applicable to conveyances, elections, releases, waivers, and the like, rather than the more generalized

one based on the place of contracting which determine the formalities required for the execution of the 1956 agreement.*

Thus far the classic rules have been applied to the fact complex in this case. This is good because, as has been sometimes said, the classic rules give greater predictability and certainty. But, the conclusion derived from this analysis would be exactly the same, if the more modern '' grouping of contacts '' doctrine is applied (*Auten* v. *Auten*, 308 N. Y. 155, *supra*; 8 N. Y. Jur., Conflict of Laws, §§ 16–17). The principal effect of the doctrine, of course, as expressed by Judge Fuld in the *Auten* case, is to avoid the rigidity of what has been described here as the more generalized rule applicable to the execution of contracts; and rather to look to the impact on the policy of the jurisdiction most intimately concerned with the outcome of the particular litigation and thereby to give effect to the probable intention of the parties (pp. 160–161). It needs no elaboration that except as to real property in Switzerland, and a little less certainly, as to movables in Switzerland, all the significant contacts in this case are in New York, albeit the Bulovas were as ambulatory as decedent's wealth permitted. In this case it is much more true than it was in the *Auten* case, that the execution of the 1956 agreement occurred where it did was '' entirely fortuitous ''. Oddly, it is widow appellant who cites and relies on the *Auten* case. As significant contacts she stresses her former residence in Switzerland, the sojourn of the contracting couple in Switzerland at the time of the execution of the agreement and, principally, the situs in Switzerland of two million dollars worth of real property owned by decedent at the time of his death. Of course, the '' grouping of contacts '' theory requires a balancing of significant contacts. It is a test which is relative. Thus viewed, it is quite evident that the more substantial and significant contacts all lie with the domiciliary state, New York. To the extent that Swiss real property is involved, as has been seen, under the classic rules, Swiss law would determine its disposition, and the '' grouping of contacts '' theory would not require otherwise.

Consequently, the conclusion in this case is made even more certain by application of the modern theory of '' grouping of contacts '' in contract cases. That theory or doctrine, which has lately received yet wider recognition, has been largely followed in the latest Tentative Draft of Restatement, Second, Conflict of Laws, which is now in preparation. The Draft shows marked

---

* Of course, if the Bulovas were Swiss nationals, even if domiciled in New York, and, particularly, if they were domiciled in Switzerland, entirely different conclusions might well be applicable (see *Matter of Schneider, supra*).

departure from the "rigid" rules of the older Restatement and a corresponding shift to the "grouping of contacts" theory. The Draft would support, emphatically, the conclusions reached in this case (Tentative Draft No. 6 [April, 1960], Restatement 2d, Conflict of Laws [Willis L. M. Reese, Reporter], §§ 332–334, including Comments and Editorial Notes).*

Hence, it is evident that the 1956 agreement was validly executed and is enforcible to the extent that New York law governs, and the New York courts direct, the administration and devolution of the assets owned by decedent at the time of death. This is so whether one look to the classic rules or to the modern theory of "grouping of contacts", which to some extent, but emphatically not entirely, is merely interpretative of what courts actually do in applying the classic rules. The widow's purported exercise of a right of election under section 18 of the Decedent Estate Law is therefore void. Nothing contained in the decree is construed to extend any further than this.

Such other questions as have been raised by appellant widow and have not been discussed are also determined to have been correctly decided by the Surrogate, including the question of an allowance of a counsel fee to widow.

Accordingly, the decree should be in all respects affirmed with costs to the petitioners-respondents and respondents-respondents payable out of the estate and without costs in favor of or against respondent-appellant.

STEVENS, EAGER, STEUER and NOONAN, JJ., concur.

Decree, so far as appealed from, unanimously affirmed, with costs to the petitioners-respondents and respondents-respondents payable out of the estate, and, without costs in favor of or against respondent-appellant.

---

* While Leflar in his text seems to place a greater emphasis on the place of contracting with respect to *marital* contracts, a full reading of his discussion shows unqualified recognition of the principles developed in the *Auten* case (*supra*) and applied in this case (Leflar, Conflict of Laws, § 174). Thus he states: "So long as no public policy against the contract appears at the forum, the effort will be to choose as governing, from among the systems of law having a substantial connection with the contract, one which will permit a good faith effectuation of the parties' evident intent. At the same time it must be remembered that, apart from the contract itself, legal effect upon titles in particular property is controlled by the law that governs the property as such, often a different law from that which governs the contract." (p. 334).