481 F.2d 257
 Viola TYMINSKI, General Administratrix and Administratrix ad
Prosequendum of the Estate of Edward Tyminski,
Deceased, Appellant,
v.
UNITED STATES of America.
Viola TYMINSKI, General Administratrix and Administratrix ad
Prosequendum of the Estate of Edward Tyminski, Deceased
v.
UNITED STATES of America, Appellant.
 Nos. 72-1024, 72-1025.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 5, 1973.
Decided June 19, 1973.
 
 1
 Jerome H. Ellis, Verlin, Goldberg, Ellis & Epstein, Philadelphia, Pa., Joseph H. Kenney, Archer, Greiner & Read, Camden, N. J., for Viola Tyminski; Charles L. Harp, Jr., of counsel.
 
 
 2
 Harlington Wood, Jr., Acting Asst. Atty. Gen., Herbert J. Stern, U. S. Atty., Alan S. Rosenthal, William D. Appler, Attys., Dept. of Justice, Washington, D. C., for the United States.
 
 
 3
 Before BIGGS and GIBBONS, Circuit Judges, and HUYETT, District Judge.
 
 OPINION OF THE COURT
 
 4
 HUYETT, District Judge.
 
 
 5
 This medical malpractice case against the United States raises questions concerning the application of the Federal Tort Claims Act's statute of limitations, 28 U.S.C. Sec. 2401(b),[1] and the proper award of damages for the value of gratuitous nursing services rendered decedent, Edward Tyminski, by his wife, the plaintiff-appellant.[2] The District Court found that the statute of limitations had not run at the time suit was brought and that damages would not be allowed for gratuitous nursing services. We affirm the judgment of the District Court on the statute of limitations issue and reverse the denial of damages for gratuitous nursing services. We remand for computation of these damages.[3]
 
 I. DISTRICT COURT'S FINDINGS
 
 6
 On May 20, 1949 Edward Tyminski received a ten (10) percent disability rating from the Veterans Administration (VA) for injuries sustained by him while serving in the military during the Second World War. The injuries were caused by pieces of shrapnel which entered his body on the right side. Complaining of progressive difficulty in walking and increased pain to his right side, Tyminski entered a VA hospital in the Bronx, New York on June 10, 1957. After taking tests, including a myelogram, the diagnosis was made that there existed a space-taking lesion of the thoracic area of the spinal cord, known as an arteriovenus angioma (AVA), extramedullary in nature, that is outside the substance of the spinal cord. An operation was performed on July 17, 1957 for exploratory purposes and to demonstrate the existence of the AVA. The operation performed was a thoracic laminectomy at T-9, 10, 11, and 12 of the spinal column. Tyminski was not informed of the risks involved in the operation.
 
 
 7
 The details of the operation were found by the District Court to include the removal of the spinous processes and laminae of the spinal column with incisions made in both the dura and arachnoid. The arachnoid was adherent to the AVA and was cleared of several of the adhesions. The bones removed during the operation, the spinous processes and laminae, were not replaced; thus, there existed a potential "dead" space where these bones had been. In addition, clearing the arachnoid involved some manipulation of the spinal cord which could cause edema of the spinal cord. Within days of the operation Tyminski began progressively to lose control of the bodily functions in his lower extremities. By July 27, 1957 Tyminski's neurological condition deteriorated into flaccid paraplegia. Within a month of the operation the complete paraplegia in the lower extremities of Tyminski's body became spastic.
 
 
 8
 Tyminski was persistently informed by the defendant's physicians that the paraplegia was due to the natural progression of the congenital AVA. The District Court, however, found that the paraplegia was caused by post-operative bleeding within the operative site which collected in the potential space outside the dura, forming an epidual hematoma and causing pressure on the spinal cord. The pressure of the hematoma created a block of the spinal cord. An epidural hematoma in these circumstances, the District Court found, requires immediate treatment consisting of a second operation for the purpose of removing the accumulated blood and stopping the source of the bleeding. The failure to re-operate and stop the post-operative bleeding was found to be the proximate cause of the paraplegia. The defendant's negligence consisted in failing to recognize the symptoms of paralysis as caused by the hematoma and in failing to re-operate and stop the post-operative bleeding. These findings of fact have not been appealed by the Government. The District Court also made elaborate findings concerning the severe suffering, until his death by pneumonia in June, 1969, caused Tyminski by the injuries inflicted on him. During a substantial portion of the time from the operation to Tyminski's death, care was rendered by his wife at their home in New Jersey. The care afforded by Tyminski's wife was essentially equivalent to the care that would have been afforded by a trained nurse had the Tyminskis been able to afford such nursing service.
 
 
 9
 Tyminski was discharged from the hospital in December 1959. He was subsequently admitted to the hospital on the following dates: (1) May 12, 1960 to July 26, 1960, (2) September 14, 1960 to June 7, 1961, (3) July 24, 1961 to June 15, 1962, (4) June 23, 1965 to November 19, 1965, and (5) January 2, 1969. On nineteen separate occasions Tyminski was subject to surgery caused by the sequallae of paraplegia.
 
 
 10
 In December, 1962 Tyminski sent a letter to a local newspaper requesting aid in his effort to "prove a service-connected disability that aggravated my condition to send me to the hospital for treatment." The letter also indicates Tyminski's belief that his pre-operative condition was worsened by the hospital treatment he had received. Furthermore, the letter indicates Tyminski's futile efforts to obtain medical assistance in proving a service-connected disability. The letter details the following efforts made in this regard: (1) Tyminski had his wife write a doctor at the VA hospital "for any evidence which might prove service-connected . . .", (3) he also had his wife "go to the Red Cross, but they could not offer any help," (3) a similar inquiry was made to a Mr. Fouratt at the Armory and (4) an inquiry was made to a representative of the Disabled American Veterans Office (DAV) in Newark, New Jersey. The letter ends with this plea to the local newspaper:
 
 
 11
 "We cannot afford an outside doctor to look into the matter. All our savings are gone. We have spent every penny on the medical supplies I need. I am trying to prove service-connected disability because I am totally disabled. The doctors and the V.A. will not help me. Perhaps in this case there is negligence on the hospital [sic] part." (emphasis supplied)
 
 
 12
 The letter was brought to the attention of the VA by Tyminski's Congressman. The VA treated the letter as a claim for increased benefits pursuant to 38 C.F.R. Secs. 3.154 and 3.158 (1972).[4]
 
 
 13
 *****
 
 
 14
 * * *
 
 
 15
 In response to Tyminski's letter the VA on April 16, 1963 replied that it was their opinion that no basis for an increased disability rating existed. The VA letter states:
 
 
 16
 In your case, the evidence is clear that your condition at the time you were hospitalized was of a progressive nature. Your present condition was obviously the normal progression or development of the pre-hospital condition. The records show that the hospital medical staff did everything known to modern medical science in an effort to alleviate, remedy or cure your neurological disorder. It is unfortunate that your condition progressed to the extent shown, but you are assured that no fault on the part of the Veterans Administration is apparent, and accordingly your claim for benefits on account of a neurological disorder must be denied.
 
 
 17
 The opinion stated in the VA letter was based on a rating decision dated March 1, 1963. This rating decision states that it is "apparent that the veteran's spinal cord function upon initial hospital admission in 1957 had already reached a degree of almost total incapacitation then and that the subsequent total paraplegia was none other than the natural progress of the congenital vascular malformation of the spinal cord [the AVA]." The rating decision is signed by three rating specialists, one of whom is a medical doctor. By letter dated December 12, 1963 Tyminski noted his disagreement with the VA's determination.
 
 
 18
 As a result of filing an appeal of the VA determination, Tyminski received a "Statement of the Case." The "Statement of the Case" summarized the medical findings upon which the March 1, 1963 rating decision was based. Like the rating decision the "Statement of the Case" was signed by a medical doctor. By letter of April 30, 1964 a representative from the DAV prepared Tyminski's appeal to the Board of Veterans Appeal. The DAV representative based the appeal on two grounds: (1) that the paralysis was caused by the shrapnel wounds which aggravated a pre-existing condition, and (2) that the paralysis was the result of the July 17, 1957 surgery "which was contra-indicated and that the exposure of the malformed mass caused paralysis. It is contended that this resulted from an error in medical judgment." The second contention made by the DAV representative first appears in the record in the statement of grounds for appeal.
 
 
 19
 The hearing before the Board of Veterans Appeal was held on June 9, 1964. One of the members of the Board hearing Tyminski's appeal was a medical doctor. At the hearing Tyminski stated as follows:
 
 
 20
 Dr. Krueger told me that I had something on my spine but he did not know what it was. Further, he told me that he was going to help me, and then the result of his helping me here I am paralyzed from the waist down. That is all I have to say.
 
 
 21
 On December 16, 1964 the Board rendered its decision denying the claim for increased compensation. In its decision the Board reviewed the hospital records of Tyminski's care and operation in 1957. The Board noted statements made at the time of Tyminski's developing paralysis to the effect that "the increased deficit could be explained only by a thrombosis of the vessels of the cord. The final pertinent diagnosis was incomplete transverse myelopathy due to arterio venus angimatous malformation of the spinal cord." It was further stated by the Board that in February, 1963 the chief of neurosurgery of the Administration hospital reviewed Tyminski's treatment. It was the chief neurosurgeon's opinion that vascular malformations of the spinal cord similar to that suffered by Tyminski "lead in the majority of cases to total paralysis. In some cases, sudden paraparesis or paraplegia was stated to occur as a result of spontaneous thrombosis or bleeding within the spinal cord and that minor effort such as lifting or abdominal strain or compression may unleash such a spinal vascular accident." The Board concluded that "the subsequent increase in the extent of paralysis was attributed to thrombosis in the affected spinal blood vessels . . . [T]he thrombosis is considered to be the proximate result of the demonstrated extreme deformity of the vessels rather than of any ordinary incident of surgery." The Board's decision was signed by three associate members, one of whom was a medical doctor. Thus, from the time of Tyminski's discharge from the VA hospital in June, 1962 until his claim for increased compensation was finally denied in December, 1964, five different medical doctors had adjudged Tyminski's injuries as resulting from a natural progression of the AVA.
 
 
 22
 Suit was brought on January 3, 1967. The Government contends that suit was untimely because the action was not begun within two years after the claim accrued. We must first determine when the claim accrued.
 
 II. STATUTE OF LIMITATIONS
 
 23
 Those Circuit courts which have been faced with the issue with but one exception have uniformly held that federal law determines when a claim accrues under the Federal Tort Claims Act, while state law determines whether the defendant's action gives rise to a cause of action. Kington v. United States, 396 F.2d 9, 11 (6th Cir.) cert. denied 393 U.S. 960, 89 S.Ct. 396, 21 L. Ed.2d 373 (1968); Kossick v. United States, 330 F.2d 933, 935-936 (2d Cir.) cert. denied 379 U.S. 837, 85 S.Ct. 73, 13 L.Ed.2d 44 (1964); Hungerford v. United States, 307 F.2d 99, 101-102 (9th Cir. 1962); Quinton v. United States, 304 F.2d 234, 235-240 (5th Cir. 1962). But see Tessier v. United States, 269 F.2d 305 (1st Cir. 1959). And for purposes of medical malpractice suits under the Federal Tort Claims Act these courts have determined that the two-year limitations period does not begin to run until "the claimant [has] discovered, or in the exercise of reasonable diligence should have discovered, the existence of the acts of malpractice upon which his claim is based." Quinton v. United States, 304 F.2d supra, at 235; see Urie v. Thompson, 337 U.S. 163, 169, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949); Cooper v. United States, 442 F.2d 908, 911 (7th Cir. 1971); Toal v. United States, 438 F.2d 222, 224-225 (2d Cir. 1971); Ashley v. United States, 413 F.2d 490, 492 (9th Cir. 1969); Coyne v. United States, 411 F.2d 987, 988 (5th Cir. 1969); Brown v. United States, 353 F.2d 578, 579 (9th Cir. 1965); Beech v. United States, 345 F.2d 872, 874 (5th Cir. 1965); Kossick v. United States, supra; Hungerford v. United States, supra.
 
 
 24
 These courts have reasoned that a rule requiring federal courts to look to state law for determining when a claim accrues under the Federal Tort Claims Act would defeat Congress' intention to have a single statute of limitations govern all tort claims asserted against the United States. Quinton v. United States, 304 F.2d supra at 236. Furthermore, it was considered more sensible and just to apply a rule for accrual in medical malpractice cases in which an individual's claim for relief would not have expired before he discovered or should have, in the exercise of reasonable diligence, discovered the acts constituting malpractice. Quinton v. United States, 304 F.2d supra at 240. This rule eliminates the harshness, and the exceptions developed in an attempt to avoid the harshness, of those states' rule of medical malpractice in which a claim accrues when the act of malpractice occurs. Quinton v. United States, 304 F.2d supra at 236. See also Lillich, The Medical Statute of Limitations in New York and Other States, 47 Cornell L.Q. 339 (1962). At the same time the rule preserves the reasons for having a statute of limitations. See Note, Developments in the Law-Statutes of Limitations, 63 Harv.L.Rev. 1177, 1185 (1950). We find persuasive both the reasoning and the impressive case law supporting these rules for accrual of claims under the Federal Tort Claims Act initially articulated in the Quinton case. Our task is to apply the federal accrual rule to the facts before us for the purpose of determining whether the District Court's finding that the claim was timely was clearly erroneous. See Toal v. United States, 438 F.2d supra at 225.
 
 
 25
 The District Court found that the proximate cause of Tyminski's injuries was the existence of post-operative bleeding within the operative site resulting in the formation of an epidural hematoma which put pressure on the spinal cord. The physicians' failure to diagnose and to remove the hematoma was found to be negligent. These findings are not challenged on appeal. Rather, it is argued by the Government that by no later than June 9, 1964, the date of the hearing before the Board of Veterans Appeal, Tyminski believed that there was, or may have been, negligence in connection with the surgical treatment he received in 1957. From this it is concluded that Tyminski's claim accrued at the latest in June, 1964, two and onehalf years before the action was filed.
 
 
 26
 This contention, however, can have no bearing on the initial question whether Tyminski knew more than two years before suit was brought that there had been post-operative bleeding in the operative site resulting in the formation of hematoma with the awareness that the hematoma caused the paralysis. Only the knowledge that these acts occurred would preclude Tyminski from asserting that he did not discover the acts constituting the alleged malpractice. In each of the medical malpractice cases which have applied the federal rule of accrual of claims the inquiry by the court has been focused on the specific acts upon which the claim for malpractice was based. See e. g., Toal v. United States, supra (known retention of pantopaque, an iodized radiopaque contrast medium used in myelograms, in the plaintiff's lumbar sac); Ashley v. United States, supra (use of a needle to draw blood from plaintiff's arm resulting in nerve damage); Brown v. United States, supra (use of excessive oxygen known to have caused infant's blindness). The record amply supports the conclusion that Tyminski did not discover the acts constituting the malpractice more than two years before the action was brought. This conclusion, however, does not end the inquiry. We must next consider the alternative inquiry whether in the exercise of reasonable diligence Tyminski should have discovered the acts constituting malpractice.
 
 
 27
 When deciding this alternative inquiry, greater weight must be accorded the Government's contention that Tyminski believed by 1964 that there may have been negligence. In addition to the statements made by Tyminski in his letter of December, 1962 and at the hearing on his claim in June, 1964, the facts surrounding the surgery performed in June, 1957 are important in deciding this question. These facts include the finding that Tyminski was not informed that injury might result from the operation and that the paraplegia resulted relatively soon after the operation. In view, however, of the unusual set of facts involving the nature of Tyminski's injuries and what surely were acts of reasonable diligence in pursuing his claim before the VA in an effort to ascertain the medical basis for his injuries, we cannot say that the District Court was clearly in error in finding that the claim had not accrued more than two years before the filing of Tyminski's complaint.
 
 
 28
 Tyminski had very little reason to doubt that his injuries were caused by the natural progression of the AVA. He entered the hospital complaining of continued pain to the right side of his body. The initial diagnosis after performance of a myelogram was that of an AVA, and this condition was represented to have been confirmed by the operation. The facts in this case also present the peculiar situation in which the injuries reasonably thought to result from the natural progress of a pre-existing congenital spine tumor were virtually identical to those which could have resulted from the medical malpractice. These factors are compounded by the persuasiveness a reasonable person must have attached to the medical opinion that paralysis could have occurred at any time because of the possibility of thrombosis. Also persuasive in determining whether in the exercise of reasonable diligence Tyminski should have discovered the acts constituting malpractice is the continuous treatment rendered Tyminski from June 1957 to at least 1962. Reasonable diligence does not require that a person who does not know of the acts constituting malpractice and who has little reason to doubt that his injury resulted from the natural progression of a pre-operative disorder interrupt the care he is receiving to cure his injuries in order to ascertain whether the persons providing the care negligently caused his injuries.[5]
 
 
 29
 Finally, Tyminski's efforts to ascertain some medical basis for increasing his disability payments represented reasonable diligence on his part. As we have demonstrated, five medical doctors reviewed the records of the hospital treatment rendered Tyminski as a result of the diligent efforts he made in his pursuit for increased disability payments. Tyminski had every reason to expect these doctors to render the same competent medical advice he might have expected of private physicians he mentioned in his letter of December, 1962 he would have consulted had he been able to afford their services. The unanimous determination by the persons reviewing Tyminski's claim that the injuries were due to the AVA is telling evidence supporting the conclusion that Tyminski in the exercise of reasonable diligence should not have discovered the existence of the acts of malpractice upon which his claim in the District Court was based. We are not, therefore, left with "the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); Fisher v. United States, 441 F.2d 1288, 1290 (3rd Cir. 1971).
 
 III. GRATUITOUS NURSING SERVICES
 
 30
 (A) CHOICE OF LAW
 
 
 31
 Under the Federal Tort Claims Act the United States is "liable to the claimant in accordance with the law of the place where the [negligent] act or omission occurred." 28 U.S.C. Sec. 1346(b). This statute has been construed to required that the whole law of the state including its choice of law rules be applied in determining the Government's negligence. Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). In applying New York's local law to determine the Government's liability for gratuitous nursing services rendered Tyminski by his wife, the District Court concluded that New York would deny plaintiff recovery for the value of these services. See Coyne v. Campbell, 11 N.Y.2d 372, 230 N.Y.S. 2d 1, 183 N.E.2d 891 (1962); Drinkwater v. Dinsmore, 80 N.Y. 390 (1880). We have concluded, however, that in applying New York's choice of law rules New York would look to New Jersey to determine recovery for the value of gratuitous nursing services and that New Jersey would allow recovery.
 
 
 32
 In Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963) New York rejected the inexorable choice of law rule in which substantive rights and liabilities arising out of a tortious occurrence are determined by the law of the place of the tort. The court in Babcock applied a "center of gravity" or "grouping of contacts" doctrine as a method of "giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue in the litigation." Id. 12 N.Y. 2d at 481, 240 N.Y.S.2d at 749, 191 N. E.2d at 283. Later New York cases have focused on the governmental interests of the states which have a relationship to the particular issue arising out of the tortious conduct. See Tooker v. Lopez, 24 N.Y.2d 569, 301 N.Y.S.2d 519, 249 N.E.2d 394 (1969); Miller v. Miller, 22 N.Y.2d 12, 290 N.Y.S.2d 734, 237 N. E.2d 877 (1968). Recently, however, the court has expressed the desire to formulate rules of general applicability reflecting the underlying values and policies which determine the law to be applied to a particular issue. In Neumeier v. Kuehner, 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972) the court states:
 
 
 33
 The single all-encompassing rule which called, inexorably, for selection of the law of the place of injury was discarded, and wisely, because it was too broad to prove satisfactory in application. There is, however, no reason why choice-of-law rules, more narrow than those previously devised, should not be successfully developed, in order to assure a greater degree of predictability and uniformity, on the basis of our present knowledge and experience. (See, e. g., Cavers, The Choice of Law Process, 121-122; Reese, Chief Judge Fuld and Choice of Law, 71 Col.L.Rev. 548, 555, 561-562; Reese, Choice of Law: Rules or Approach, 57 Corn.L.Rev. 315, 321 et seq.; Rosenberg, Comments on Reich v. Purcell, 15 U.C.L.A.L.Rev. 641, 642, 646-647.) "The time has come," I wrote in Tooker (24 N.Y.2d, at p. 584, 301 N.Y.S.2d at p. 532, 249 N.E.2d at p. 403), "to endeavor to minimize what some have characterized as an ad hoc case-by-case approach by laying down guidelines, as well as we can for the solution of guest-host conflicts problems." Babcock and its progeny enable us to formulate a set of basic principles that may be profitably utilized, for they have helped us uncover the underlying values and policies which are operative in this area of the law. To quote again from the concurring opinion in Tooker (p. 584, 301 N.Y.S.2d p. 532, 249 N.E.2d p. 408), "Now that these values and policies have been revealed, we may proceed to the next stage in the evolution of the law-the formulation of a few rules of general applicability, promising a fair level of predictability."
 
 
 34
 Id. 31 N.Y.2d at 127-128, 335 N.Y.S.2d at 69, 286 N.E.2d at 457.
 
 
 35
 A general rule applicable to the measure of damages was set out by the New York Court of Appeals in James v. Powell, 19 N.Y.2d 249, 279 N. Y.S.2d 10, 225 N.E.2d 741 (1967). In James the court stated:
 
 
 36
 Although it is clear that the measurement of compensatory damages is determined by the same law under which the cause of action arises, [citations omitted] this is not necessarily true with regard to exemplary damages. An award of compensatory damages depends upon the existence of wrongdoing-in this case, an issue for resolution under the lex situs of the property alleged to have been fraudulently conveyed. An award of punitive damages, on the other hand, depends upon the object or purpose of the wrongdoing and on this issue we should look to the "law of the jurisdiction with the strongest interest in the resolution of the particular issue presented."
 
 
 37
 Id. 19 N.Y.2d at 259, 279 N.Y.S.2d at 17-18, 225 N.E.2d at 746-747. New York does not view recovery for the value of nursing services gratuitously rendered as compensatory damages. This seems clear from Coyne v. Campbell, 11 N.Y.2d supra at 376, 230 N.Y.S.2d supra at 4, 183 N.E.2d supra at 893 where the court states that "[i]t would hardly be fair in a negligence action, where damages are compensatory and not punitive, to change the Drinkwater [v. Dinsmore, supra] rule of long standing in the fact of the Legislature's refusal to do so, and to punish a defendant by requiring him to pay plaintiff for a friend's generosity." On the other hand, recovery for the value of nursing services rendered gratuitously does not fit neatly the classification punitive damages. It cannot be said that the physicians in this case had any object or purpose to their wrongdoing. Nevertheless, it seems clear that New York would apply a governmental interest approach to determine recoverability even for compensatory damages when there exists no conflict between states with an interest in the issue of damages concerning whether a cause of action exists resulting from the defendant's conduct. This conclusion follows from the use by New York of a governmental interest approach to determine what state's law applies in considering whether the plaintiff has made out a cause of action. See Long v. Pan Amer. World Airways, Inc., 16 N.Y.2d 337, 266 N.Y.S.2d 513, 213 N.E.2d 796 (1965); Restatement, Second, Conflict of Laws Sec. 171 (1971).[6]
 
 
 38
 A rule of recovery for damages reflecting the governmental interest approach was applied in Thomas v. United Air Lines, Inc., 24 N.Y.2d 714, 301 N.Y. S.2d 973, 249 N.E.2d 755 (1969), cert. denied, 396 U.S. 991, 90 S.Ct. 484, 24 L. Ed.2d 453 (1969). Thomas involved the issue whether the Illinois $30,000 limitation on wrongful death actions should apply to a suit by passengers of an airplane which crashed in th navigable waters of Illinois. The passengers were residents of New Jersey, Connecticut and Iowa. Having decided that federal maritime law did not preclude decision by a state court, the court rejected application of Illinois' limitation on damages for wrongful death. The court then quoted from Manos v. Trans World Airlines, 295 F.Supp. 1170, 1173 (N.D.Ill.1969) as follows: "The predominant interests to be served on the issue of damages are those of the states containing the people or estates which will receive the recoverable damages, if any, for their injuries or their decedent's death." The Manos court was a federal court sitting in Illinois and applying Illinois' choice of law principles. Thomas applied this reasoning to reject application of Illinois' limitation on recovery for wrongful death.
 
 
 39
 Tyminski was a resident of New Jersey throughout the time the nursing care was rendered to him by his wife and until his death in 1969. Under the reasoning applied in Thomas New Jersey law would determine the measure of damages for injuries the liability for which New York would grant recovery when there exists no object of wrongdoing New York would have a particular interest in preventing. See also Cumming v. United Air Lines, 71 Misc.2d 1024, 338 N.Y.S.2d 20, 23 (Sup.Ct.N.Y. 1972); In re Estate of Caccamo, 71 Misc.2d 391, 336 N.Y.S.2d 77, 81 (Surrogate's Ct. Kings County 1972).
 
 
 40
 Finally, the Government contends that in looking to New Jersey law to determine recovery for nursing services gratuitously rendered New York would look to New Jersey's choice of law rules and that in applying New Jersey's choice of law rules New Jersey would look to New York as the place where the tort occurred to determine the measure of damages. The concept of looking to the whole law of another state including its choice of law rule is referred to as renvoi. See In re Schneider's Estate, 198 Misc. 1017, 96 N.Y.S.2d 652, aff'd on rearg. 198 Misc. 1017, 100 N.Y.S.2d 371 (Surrogate's Ct. N.Y.County 1950). Renvoi has often been thought useful in providing flexibility to choice of law determinations. See Griswold, Renvoi Revisited, 51 Harv.L.Rev. 1165 (1938). The concept has had little application, however, beyond determining interests in land and in determining the validity of a decree of divorce. See N. Reese and M. Rosenberg, Conflict of Laws Cases and Materials 505 (1971). But see University of Chicago v. Dater, 277 Mich. 658, 270 N.W. 175 (1936). With the exception of matters involving land and divorce Restatement, Conflict of Laws Sec. 7 rejected the reference by the forum state to the choice of law rules of the referent state. Restatement, Second, Conflict of Laws Sec. 8 takes a broader view of the use of renvoi.
 
 
 41
 We need not, however, consider the circumstances under which New York in referring to New Jersey law to decide the issue before us would apply the choice of law rules of New Jersey or simply New Jersey's local law. New Jersey applies a governmental interest analysis in determining choice of law issues. See Melk v. Sarahson, 49 N.J. 226, 229 A.2d 625 (1967). Thus, New Jersey, in applying its choice of laws rule to the issue before us, would reach the same result which we have determined New York would reach in applying its choice of law rule-that is, that New Jersey law would apply. This can only refer to New Jersey's local law. And even were we to find that New Jersey would apply New York law, New Jersey in turn would apply New York's choice of law rule. See Pfau v. Trent Aluminum Co., 55 N.J. 511, 263 A.2d 129 (1970). Again, we would be left with applying New Jersey's local law in order to remain faithful to the governmental interests involved in the issue before us.
 
 
 42
 (B) RECOVERY FOR NURSING SERVICES
 
 
 43
 New Jersey allows for the recovery of the reasonable value of medical expenses necessitated by a defendant's tortious conduct. See Coll v. Sherry, 29 N.J. 166, 148 A.2d 481, 485 (1959); Work v. Philadelphia Supply Co., 95 N. J.L. 193, 196, 112 A. 185 (E. & A. 1920). New Jersey's highest court, however, has never decided whether recovery is allowed for the reasonable value of medical expenses necessitated by the tortfeasor's action but not incurred by the injured person because the services have been rendered gratuitously by the injured person's spouse. In resolving this issue we must apply the rule which the state's highest court would apply were it faced with the question. Cf. Feeley v. United States, 337 F.2d 924 (3rd Cir. 1964).
 
 
 44
 Tort law seeks to compensate a person for injuries caused by defendant's breach of duty. Feeley v. United States, 337 F.2d supra at 926; 2 Harper and James, The Law of Torts Sec. 25.1 at p. 1299 (1956). Despite this rationale most American jurisdictions do not permit the defendant in an action for negligence "to establish that the plaintiff did not actually sustain the amount of injury alleged, if diminution resulted from the conduct of a third person." Note, Unreason in the Law of Damages: The Collateral Source Rule, 77 Harv. 741 (1964). See also 2 Harper and James, The Law of Torts Sec. 25.22 at p. 152 (Supp. 1968). Application by courts of the collateral source rule has been criticized for the failure to articulate the reasons underpinning application of the rule in any given case. The caution expressed in Helfend v. Southern California Rapid Transit District, 2 Cal.3d 1, 6 n. 3, 84 Cal.Rptr. 173, 175 n. 3, 465 P.2d 61, 63 n. 3 (1970) seems most appropriate: "There are many sorts of collateral sources and a great variety of contexts in which the 'rule' might be applied. We expressly do not consider or determine the appropriateness of the rule's application in the myriad of possible situations which we have not discussed or which are not presented by the facts in this case." See also Feeley v. United States, 337 F.2d supra at 927-928. With this view in mind we proceed to determine the applicability of the rule to the issue before us as the rule has been formulated in New Jersey.
 
 
 45
 The collateral source rule is clearly recognized in New Jersey and has been given an expansive application by the courts of that State. In Long v. Landy, 35 N.J. 44, 171 A.2d 1 (1961) the administrator of the estate of the plaintiff's husband was the third-party defendant in an action brought by the widow for injuries arising out of an automobile collision. The administrator sought to reduce the widow's recovery against her husband's estate by the amount of money received by the widow as a result of health insurance coverage, premiums for which had been paid by the husband, accident insurance coverage, stocks that devolved on the widow and other valuables received by the widow as a result of her husband's death. In refusing to allow reduction of plaintiff's recovery the court stated:
 
 
 46
 The administrator admits that ordinarily a tort-feasor may not set up in mitigation of damages payments made to injured persons from collateral sources. Cornish v. North Jersey St. Ry. Co., 73 N.J.L. 273, 62 A. 1004 (Sup.Ct.1906); Skillen v. Eagle Motor Co., 107 N.J.L. 211, 152 A. 854 (Sup.Ct.1930); Rusk v. Jeffries, 110 N.J.L. 307, 164 A. 313 (E. & A. 1932). He seeks, however, to distinguish the case sub judice from the general rule, by reason of the fact that the premiums for the policies under which the payments were here made to plaintiff were paid by defendant. There is no direct proof of the source of payments of these premiums. In any event, we see no reason to deviate from the general rule insofar as the payments for medical and hospital expenses are concerned merely because the husband paid the premiums. This does not affect the common law rule that a tortfeasor may not benefit by payments to the injured party from collateral sources. Plaintiff was the direct contractual beneficiary of these policies which vested her with a property right. Cf. Metropolitan Life Insurance Co. v. Dinzik, 141 N.J.Eq. 336, 57 A.2d 247 (Ch.1948). Furthermore, the payment of the death benefits arising upon the husband's decease, the vesting of the jointly owned stock in plaintiff upon the death of the husband, and the inheritance through the estate of the husband, cannot be considered compensation for the injuries inflicted upon plaintiff through the wrongful act of her husband. The contractual right is separate and distinct from any right she may have to recovery for the quantum of damages sustained by her from the independent tortious act of her husband. The two should not be confused.
 
 
 47
 Id. 35 N.J. at 55-56, 171 A.2d at 7-8. Dubil v. LaBate, 52 N.J. 255, 245 A.2d 177 (1968) presented the question whether the remarriage of a surviving spouse may be utilized by a defendant in a wrongful death action to mitigate damages. The measure of damages under New Jersey's wrongful death statute, N.J.S. 2A:31-1 et seq. provided for "the deprivation of a reasonable expectation of a pecuniary advantage which would have resulted by a continuance of the life of the deceased." In holding that remarriage of a surviving spouse would not reduce the recovery provided by the statute the court stated:
 
 
 48
 That the receipt of such benefits should not reduce the award long has been recognized in the doctrine that a tortfeasor may not show in mitigation of damages that the plaintiff has received pecuniary advantages from a collateral source. Patusco v. Prince Macaroni, Inc., 50 N.J. 365, 368, 235 A.2d 465 (1967) (holding that a wife may recover medical expenses from a tort-feasor despite the fact that her husband, and not she, is responsible for their payment); Long v. Landy, 35 N.J. 44, 55-56, 171 A.2d 1 (1961) (holding that a wife's recovery from her husband's estate for injuries negligently inflicted upon her by the husband is not reduced by inheritance from the husband and payments made to her under his insurance policies); Muradian v. Paganessi, 3 N.J.Misc. 320, 128 A. 158 (Sup.Ct.1925) (holding that the receipt by plaintiff of insurance on the life of the decedent may not be shown in a wrongful death action to reduce plaintiff's recovery); Hexamer v. Public Service Railway Co., 4 N.J.Misc. 184, 132 A. 310 (Sup. Ct.1926) (holding that a widow's recovery for the death of her husband was not to be diminished by the inheritance she received from him). See also Rusk v. Jeffries, 110 N.J.L. 307, 311, 164 A. 313 (E. & A. 1933); Weber v. Morris and Essex R. R. Co., 36 N.J.L. 213, 215 (Sup.Ct.1873). As we recently said in Patusco, supra 50 N.J. at p. 368, 235 A.2d p. 466: "It should not concern the tortfeasor that someone else is obligated to aid his victim because of a duty assumed by contract or imposed by law. * * * [A] wrongdoer cannot claim the benefit of the rights his victim may have against others by virtue of contract, employment, or other relation." We conclude that when the "someone else" is a new husband who has assumed, by marital obligation, the duty to support the widow, his contributions are analogous to pecuniary benefits received from insurance, inheritance, employment, or other collateral sources. Just as a widow's receipt of an inheritance from a relative will not decrease the recoverable loss of her deceased husband's potential pecuniary contributions, so her receipt of financial benefits from a new husband-or the possibility thereof-should not be used to reduce her recovery.
 
 
 49
 Id. 52 N.J. at 260-261, 245 A.2d at 179-180.
 
 
 50
 The principle applied in Long and Dubil would be applied in the same manner to services paid for by another regardless of whether a person is under a legal duty to provide payment. In Rusk v. Jeffries, 110 N.J.L. 307, 164 A. 313 (E. & A. 1933) the court affirmed the refusal by the trial court to allow defendant to show that the plaintiff, injured in an automobile accident, was receiving a pension. The court went on to state that the "general and more reasonable rule is that the amount so paid, regardless of whether paid pursuant to contract or as a gratuity, cannot operate to reduce the damages recoverable against a tortfeasor." See also Cornish v. New Jersey State Ry. Co., 73 N.J.L. 273 (Sup.Ct. 1906); Weber v. Morris and Essex R. R. Co., 36 N.J.L. 213 (Sup.Ct.1873). Similarly, in Skillen v. Eagle Motor Co., 107 N.J.L. 211, 152 A. 854 (Sup.Ct. 1931) the court held that an injured sister could recover the cost of medical services even though the expenses had been paid for by a brother and sister gratuitously. See also Cowan v. Kaminow, 128 N.J.L. 398, 406, 26 A.2d 258, 262 (E. & A. 1942) (court refused to diminish damages when medical expenses were paid by injured person's daughters). We discern no distinction in these cases between recovery for the value of medical services gratuitously paid for by a relative as opposed to medical services gratuitously rendered by a relative. And it seems certain that New Jersey would not so limit the application of its collateral source rule.
 
 
 51
 The only limitation expressed by New Jersey courts on the collateral source rule was stated in Theobold v. Angelos, 44 N.J. 228, 208 A.2d 129 (1965). In Theobold the Court stated that "the law does not frown upon a greater satisfaction [for injuries caused by defendant's tortious conduct] if there is no threat to the public interest or unfair advantage taken of another." Id. 44 N.J. at 239, 208 A.2d at 134. The court reasoned that because of the imprecision involved in knowing whether the injured person has been made whole by a damages award it is not unfair that a tortfeasor be required to provide recovery for injuries caused by him even though expenses were not incurred by the injured person. This reasoning requires the conclusion that New Jersey would allow as a measure of damages that a person injured by tortious conduct recover the value of nursing services gratuitously rendered by a spouse.
 
 IV.
 
 52
 A number of other matters raised by the parties require only brief discussion. Plaintiff-Appellant contends that the District Court's award of damages, exclusive of the award for loss of income, was so inadequate as to be clearly erroneous and that an award, separate from the award for pain and suffering, must be made for loss of enjoyment of life's pleasures and for the shortening of life expectancy. These contentions are without merit.
 
 
 53
 The District Court awarded plaintiff-appellant $175,000 for pain and suffering and $125,423 for loss of earnings. An appellate court will not reverse the lower court's award of damages unless it is clear that the court below erred. A review of the findings concerning the pain and suffering caused Tyminski by appellee's negligence does not leave us with the firm conviction that the award was so inadequate as to warrant interference at the appellate level. Martella v. Great Atlantic & Pacific Tea Co., 418 F.2d 1246-1247 (3rd Cir. 1969). It is also clear to us that the District Court included as an element of damages an award for loss of enjoyment of life's pleasures. The District Court made specific findings relating to loss of enjoyment of life's pleasures. Based partly on these findings, the court awarded damages "for the inclusive area of pain and suffering." The only reasonable conclusion that can be drawn from the court's award of damages is that the loss of enjoyment of life's pleasures was included as an element in the total award for pain and suffering. Thus, there was no error in failing to expressly state the distinct damages for this loss. Finally, there is no state law authority to support a separate award for shortening life's expectancy. Cf. Downie v. United States Line Co., 359 F.2d 344 (3rd Cir.) cert. denied 385 U.S. 897, 87 S.Ct. 201, 17 L.Ed.2d 130 (1966). The District Court's disposition of this issue was correct.
 
 
 54
 Defendant-Appellee contends that the District Court's award of damages for loss of earnings was clearly erroneous. The contention is based on evidence in the record that Tyminski, prior to the injuries caused by the defendant-appellee's negligence, walked with an "unsteady gait" and had been awarded a total disability rating from the VA. The District Court, however, found that Tyminski was ambulatory before the operation and would have been able to earn $3000 a year but for the defendant-appellee's negligence. There is evidence in the hospital records supporting the District Court's finding on this issue. We cannot say that other evidence cited by the Government, characterizing Tyminski's difficulty in walking, deprives the District Court's finding of such probative value which would enable us to consider the finding clear error. The District Court's finding on this matter must therefore be affirmed.
 
 
 55
 The District Court's judgment awarding damages for loss of earnings and for pain and suffering is affirmed; the judgment denying damages for the value of nursing services rendered by appellant is reversed. The case is remanded for computation of damages for the value of nursing services. Offsets, in the amounts stated in a letter addressed to this court dated February 6, 1973, against the awards for loss of earnings and for nursing services rendered will be allowed for payments made by the Government to Tyminski.[7]
 
 
 
 [1]
 28 U.S.C. Sec. 2401(b) provides that a "tort claim against the United States shall be forever barred unless such action is begun within two years after such claim accrues. . . ."
 The statute was amended in 1966 to require presentation of the claim to the appropriate Federal agency within two years after the claim accrues and suit within six months of the claim's denial, P.L. 89-506, Secs. 2(a), 7, 80 Stat. 307, amending 28 U.S.C. Secs. 2401, 2675. The effective date of Secs. 2(a) and 7 was two weeks after the complaint in this case was filed. See P.L. 89-506, Sec. 10, 80 Stat. 307.
 
 
 [2]
 The Plaintiff-Appellant also challenges the adequacy of the District Court's award of damages, and the failure of the District Court to make a separate award for loss of enjoyment of life's pleasures and for the shortening of life expectancy. Defendant-Appellee also challenges the District Court's award for loss of earnings and the failure to allow an offset for certain payments made by the Government to Tyminski. These matters are discussed infra
 
 
 [3]
 In the briefs on appeal and by letter to this court dated February 6, 1973, the appellant concedes that the Government is entitled to certain offsets against an award for loss of income and for the value of nursing services. The District Court will take these offsets into consideration on remand of this case
 
 
 [4]
 38 C.F.R. provides in relevant part:
 
 
 [3]
 154 Injury due to hospital treatment, etc
 A formal claim for pension, compensation, dependency and indemnity compensation or any statement in a communication showing an intent to file a claim for disability or for death benefits resulting from the pursuit of a course of vocational rehabilitation, hospitalization, medical or surgical treatment, or examination under Veterans Administration laws may be accepted as a claim.
 
 
 [3]
 358 Determinations for disability or death from hospitalization, medical or surgical treatment, examinations or vocational rehabilitation training
 (c) Cause. In determining whether such additional disability resulted from a disease or an injury or an aggravation of an existing disease or injury suffered as a result of training, hospitalization, medical or surgical treatment, or examination, the following considerations will govern:
 (3) Compensation is not payable for either the usual or unusual after results of approved medical care properly administered, in the absence of a showing that the disability proximately resulted through carelessness, accident, negligence, lack of proper skill, error in judgment, or similar instances of indicated fault on the part of the Veterans Administration.
 
 
 [5]
 Plaintiff-Appellant has argued on appeal that continuous treatment should act as an alternative test for determining when a claim accrues under the Tort Claims Act. We reject this approach. We find no value in the contention that a person who knows of the existence of the acts upon which his claim for negligence in a medical malpractice case is based may nevertheless forestall bringing suit until the treatment for his injuries is complete. The rationale for the continuous treatment rule as expressed by the New York Court of Appeals in Borgia v. City of New York, 12 N.Y.2d 151, 237 N.Y.S.2d 319, 187 N.E.2d 777 (1962) does, however, have value in determining reasonable diligence to discover the acts constituting negligence. For this reason we do not reject the rule completely as did the Ninth Circuit in Ashley v. United States, 413 F. 2d 490 (9th Cir. 1969)
 The Ashley court viewed the rule's rationale as only applicable, if at all, to situations in which physicians conspire to conceal their negligence from the patient. Concealment, however, is not the rationale for the rule expressed in Borgia v. City of New York, supra, and Kossick v. United States, 330 F.2d 933, 936 (2d Cir.) cert. denied, 379 U.S. 837, 85 S.Ct. 73, 13 L. Ed.2d 44 (1964). Rather, the rule is premised on the notion that a person should not be required to investigate the cause of his injuries or to bring suit while receiving necessary treatment for the injuries. The interest in preventing stale claims convinces us that this rationale for the rule has no merit when a person knows of the acts constituting negligence. In this situation little, if any, investigation is necessary to determine whether a meritorious cause of action exists. A different situation is posed, however, when a person does not know of the acts constituting negligence. Under these circumstances the rationale for the continuous treatment test has value in determining the exercise of reasonable diligence to discover the acts constituting negligence. In the case sub judice there exist factors in addition to continuous treatment which necessarily enter into a determination of reasonable diligence.
 
 
 [6]
 The claim in this case, of course, arises under the Federal Tort Claims Act. Reference to the Tort Claims Act would, however, not be helpful since the Act requires reference to state law in determining the issue of liability. See 28 U.S.C. Secs. 1346(b), 2674 (1970)
 
 
 [7]
 The pertinent portions of plaintiff-appellant's letter state as follows: "[P]laintiff-appellant concedes that the government is entitled to a reduction of the award from lost earnings of $13,342.62 [and that the nursing services award] would be subject to a reduction of $11,584.51."