**William A. KUBRICK, Appellee,**

v.

**UNITED STATES of America,
Appellant.**

**No. 77–2388.**

United States Court of Appeals,
Third Circuit.

Argued June 7, 1978.

Decided July 27, 1978.

Barbara Allen Babcock, Asst. Atty. Gen., David W. Marston, U. S. Atty., Philadelphia, Pa., William Kanter, Alice Mattice, Attys., Dept. of Justice, Civil Div., App. Section, Washington, D. C., for appellant.

Benjamin Kuby, Paul N. Minkoff, Klovsky, Kuby & Harris, Philadelphia, Pa., for appellee.

Before ADAMS, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

Because of the unusual factors associated with the discovery of harm caused by medical malpractice, federal courts have adopted a flexible interpretation of the limitation period for filing a claim under the Federal Tort Claims Act. In this case, the plaintiff contended at an early date in administrative proceedings that a drug prescribed by a Veterans Administration physician had destroyed his hearing. However, it was not until some years later that he learned it was negligent to administer the drug as was done in his treatment. The district court, holding that the limitation period did not begin until the plaintiff learned of the malpractice, entered judgment in his favor against the government. We affirm, but remand for the limited purpose of applying a statutorily mandated set-off.

Alleging injury received as a result of medical malpractice by the Veterans Administration, the plaintiff filed suit under the Federal Tort Claims Act. 28 U.S.C. § 2674 (1976). After trial, the district court entered judgment in his favor in the amount of $320,536 and the government appealed.

On April 2, 1968, the plaintiff entered the Wilkes-Barre Veterans Administration Hospital for treatment of osteomyelitis—a bone infection—in the right leg. After surgery,

a Veterans Administration physician ordered that a solution of the antibiotic, neomycin, be used to irrigate the wound. On April 30, 1968, plaintiff was discharged from the hospital, and about a month later began to notice a loss of hearing, accompanied by an increasing ringing sensation in his ears. An ear specialist in Scranton, Pennsylvania verified a hearing impairment. In November of that year, plaintiff consulted an ear specialist in Philadelphia, Dr. Joseph Sataloff, who confirmed the diagnosis of bilateral nerve deafness. After reviewing the Veterans Administration Hospital records, Dr. Sataloff told the plaintiff that neomycin is an ototoxic drug—that is, one which can impair hearing—and that this either was or probably was the cause of his hearing problem. At the trial, it was controverted whether Dr. Sataloff had told the plaintiff that there was an "excellent chance" that neomycin had caused the hearing loss or had stated causation in a more unequivocal fashion. However, the doctor testified that he did not state or imply there was negligence in the administration of the drug.

In April, 1969, Kubrick filed for an increase in disability benefits under 38 U.S. C.A. § 351 (Supp.1978),[1] alleging that neomycin had caused his deafness but making no mention of malpractice. The plaintiff had a twelfth-grade education, and no training in the medical field. He had the

claim prepared by a service officer of the Disabled American Veterans. In August of 1969, a Veterans Administration Board of Physicians denied the claim, finding no causal relationship between the neomycin and the hearing loss. The Board also declared there was no evidence of carelessness, error in judgment, or lack of proper skill on the part of the Veterans Administration. The following month, a Veterans Administration adjudication officer told plaintiff that his claim had been denied because the hearing loss was not attributable to his treatment by the Veterans Administration. On September 25, 1969, the plaintiff filed a "Statement in Support of Claim" which he and his wife had prepared, asserting that the neomycin had caused his deafness; the Veterans Administration again denied the claim. After obtaining statements from the Public Health Service and an ear specialist stating that neomycin could be ototoxic, plaintiff wrote to various public officials pleading for help in obtaining disability benefits. These letters did not change the position of the Veterans Administration, which continued to deny a connection between the administration of the neomycin and the plaintiff's deafness.

On May 20, 1971, the Veterans Administration sent plaintiff a copy of one of its field investigator's reports, which purported to quote Dr. Soma, the first ear specialist plaintiff consulted after his discharge from

1. § 351. Benefits for persons disabled by treatment or vocational rehabilitation

"Where any veteran shall have suffered an injury, or an aggravation of an injury, as the result of hospitalization, medical or surgical treatment, or the pursuit of a course of vocational rehabilitation under chapter 31 of this title, awarded under any of the laws administered by the Veterans' Administration, or as a result of having submitted to an examination under any such law, and not the result of such veteran's own willful misconduct, and such injury or aggravation results in additional disability to or the death of such veteran, disability or death compensation under this chapter and dependency and indemnity compensation under chapter 13 of this title shall be awarded in the same manner as if such disability, aggravation, or death were service-connected. Where an individual is, on or after December 1, 1962, awarded a

judgment against the United States in a civil action brought pursuant to section 1346(b) of title 28, United States Code, or, on or after December 1, 1962, enters into a settlement or compromise under section 2672 or 2677 of title 28, United States Code, by reason of a disability, aggravation, or death treated pursuant to this section as if it were service-connected, then no benefits shall be paid to such individual for any month beginning after the date such judgment, settlement, or compromise on account of such disability, aggravation, or death becomes final until the aggregate amount of benefits which would be paid but for this sentence equals the total amount included in such judgment, settlement, or compromise."

Plaintiff was receiving a pension for partial disability because of a back injury received while on active duty with the United States Army in Korea.

the Veterans Hospital. According to the investigator, Dr. Soma said that the plaintiff's problem stemmed from his employment in a machine shop. Angered by this report, plaintiff confronted Dr. Soma on June 2, 1971, a date critical in the resolution of this case. The physician denied making the statement attributed to him, and said, furthermore, it was his opinion neomycin never should have been used and that it was the sole cause of plaintiff's hearing disability. During a visit to Dr. Sataloff several weeks later, plaintiff asked the physician if there was anything that could be done. Dr. Sataloff suggested plaintiff see an attorney, and, upon learning he did not have a lawyer, the doctor recommended one. Until that time, plaintiff had not sought legal assistance.

The Board of Veterans Appeals once again denied plaintiff's claim on August 9, 1972; one month later he filed suit in the district court. Discovering the necessity of filing an administrative claim to comply with the Tort Claims Act, plaintiff filed the Standard Form 95[2] in January, 1973. The claim was denied in April, 1973, and the action proceeded in the district court.

The district judge made extensive findings of fact, establishing that the Veterans Administration had been negligent in prescribing neomycin for plaintiff's treatment. The court also found that the two year period of limitations did not begin to run until the plaintiff visited Dr. Soma in June, 1971, when he learned for the first time that administration of neomycin had been improper. Stating that plaintiff's deafness was irreversible and had resulted in serious emotional problems, as well as loss of employment, the court awarded damages in the sum of $320,536.

The government does not contest either the finding of malpractice or the amount of damages awarded[3], but confines its attack to two points—the limitations period specified by 28 U.S.C. § 2401(b),[4] and the district court's failure to set off veterans benefits received against the verdict.

■ The government concedes that medical malpractice cases are a recognized exception to the rigid rule under the Federal Tort Claims Act that a claim accrues at the time of the plaintiff's injury. This court and courts of appeals in other circuits have held that the two-year limitations period does not begin to run until the claimant has discovered, or in the exercise of reasonable diligence should have discovered, the existence of the acts of malpractice upon which his claim is based. *Tyminski v. United States,* 481 F.2d 257, 263 (3d Cir. 1973). This interpretation was adopted to avoid the harshness in many instances of time-barring an individual's claim before he realized that he had been the victim of malpractice. *See, e. g., Quinton v. United States,* 304 F.2d 234 (5th Cir. 1962).

The test of "discovery of the existence of the acts of malpractice upon which the claim is based," while apparently precise,

---

**2.** 28 C.F.R. § 14.2 provides:

"For purposes of the provisions of section 2672 of Title 28, United States Code, a claim shall be deemed to have been presented when a Federal agency receives from a claimant, his duly authorized agent or legal representative, an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death alleged to have occurred by reason of the incident. If a claim is presented to the wrong Federal agency, that agency shall transfer it forthwith to the appropriate agency."

Because the regulation specifies terms upon which the government has consented to be sued, we have held that compliance is neces-

sary. *See Bialowas v. United States,* 443 F.2d 1047 (3d Cir. 1971).

**3.** Because neither issue is relevant to this appeal, we do not discuss them here. A full explication, however, is found in the district court's opinion, reported in *Kubrick v. United States,* 435 F.Supp. 166 (E.D.Pa.1977).

**4.** Section 2401(b) states:

"A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate federal agency within two years after such a claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final determination of the claim by the agency to which it was presented."

has proved to be troublesome in application. In many cases, the problem centers upon determining when the plaintiff discovered the substance or condition which actually caused his injury. Thus, in *Tyminski v. United States, supra,* not until the plaintiff learned that his paralysis was caused by surgical error, rather than the natural progression of a preexisting condition, did the limitation period begin to run. In *Caron v. United States,* 548 F.2d 366 (1st Cir. 1976), the limitation period commenced when parents learned that an improper injection given while she was an infant caused brain damage to their 12-year-old daughter. *See also Portis v. United States,* 483 F.2d 670 (4th Cir. 1973) (neomycin improperly administered in 1963, causing deafness, not recognized as the culprit until 1969); *Toal v. United States,* 438 F.2d 222 (2d Cir. 1971) (pantopaque dye left in spinal column after myelogram discovered years later to be cause of brain inflammation).

These cases, however, are not precisely on point because here, the plaintiff was aware a few months after his hearing loss began that neomycin was most likely responsible for his hearing problem. A fact situation quite similar was present in *Jordan v. United States,* 503 F.2d 620 (6th Cir. 1974). In that case, the plaintiff underwent surgery on his nose in a Veterans Administration Hospital in order to correct a sinus condition. His eye was damaged during the operation, and a few days later, a staff physician told him the procedures required to deal with the unanticipated "severity" of the sinus condition caused the injury. Three years later, during a periodic examination, a physician told plaintiff it was "too bad they screwed up your eye when they operated on your nose." Plaintiff then retained a lawyer and brought suit against the government. The Court of Appeals for the Sixth Circuit held that the limitation period did not begin to run until plaintiff learned of the malpractice. As the court phrased it:

> Implicit in the federal cases applying this "discovery" rule is the requirement that the claimant must have received some information, either by virtue of acts he

has witnessed or something he has heard, or a combination of both, which should indicate to him when reasonably interpreted in light of all the circumstances, that his injury was the result of an act which could constitute malpractice. *Id.* at 622.

The *Jordan* opinion reflects that although the plaintiff knew his eye injury was attributable to the surgery performed on his nose, he was not aware that the procedure constituted malpractice.

*Bridgford v. United States,* 550 F.2d 978 (4th Cir. 1977), is also instructive. There, the court held that the limitation should not begin "until a claimant has had reasonable opportunity to discover *all* of the essential elements of a possible cause of action— duty, breach, causation, damages." *Id.* at 981–82 (emphasis in original). This approach was also adopted by the Court of Appeals for the Tenth Circuit in *Exnicious v. United States,* 563 F.2d 418, 420 (10th Cir. 1977).

Here, the district court said that the limitation period does not begin to run even though the patient perceives the relationship between treatment and injury, if despite due diligence, he has no reason to believe there was any negligence. The government contends such a standard allows a plaintiff to delay the claim's accrual date until he discovers that there was legal negligence, or carried to its extreme, "when he gets a professional medical opinion that medical malpractice was involved—*i. e.,* that he should file a lawsuit." (Government Brief at 41). We do not believe this to be an accurate assessment of the court's rationale because it ignores a subsequent passage in the court's opinion saying that the claim period begins to run when "the plaintiff had reason at least to suspect that a legal duty to him had been breached." 435 F.Supp. 166, at 185.

■ In most cases, knowledge of the causal connection between particular matters of treatment and injury, without more, will or should alert a reasonable person that there may have been an actionable wrong.

But in the few instances where a patient, although aware of the nexus between treatment and injury, has no reason to believe that negligence was present, a different rule applies. In these situations, if the plaintiff can prove that in the exercise of due diligence he did not know, nor should he have known, facts which would have alerted a reasonable person to the possibility that the treatment was improper, then the limitation period is tolled. For example, the plaintiff in *Jordan,* whose eye was injured as a result of his sinus operation, may very well have believed that such eye involvement was an unavoidable result of the operation, and indicated no impropriety in the manner of treatment. In such a case, the cause of action for medical malpractice should not accrue upon mere knowledge of causation. Something more should be required. Any other result would be inequitable and contrary to the "blameless ignorance" rationale underlying the *Quinton* discovery rule.

The test necessarily must be applied on an ad hoc basis, but it does require consideration of subjective, as well as objective standards. Thus, in *Sanders v. United States,* 179 U.S.App.D.C. 272, 551 F.2d 458 (1977), the limitation period was not tolled despite the plaintiff's assertions that she did not know of the connection between her injury and earlier treatment. In denying recovery, the court relied upon the facts that plaintiff was a registered nurse and had gained possession of her hospital records soon after the treatment. *See also Reilly v. United States,* 513 F.2d 147 (8th Cir. 1975).

In the case *sub judice,* the district court found that the plaintiff suspected negligence only after the June, 1971 interview with Dr. Soma. The trial judge also held that plaintiff's prior belief that there was no malpractice was reasonable in view of several other factors: the technical complexity of the question whether his neomycin treatment involved excessive risk, the failure of any of his doctors to suggest before June, 1971 the possibility of negligence, and the government's repeated denials of causation.

The government argues, however, that the various claims submitted by the plaintiff in his correspondence are inconsistent with his position at trial. The plaintiff testified that he thought he was entitled to an increased disability allowance as a result of the neomycin treatment even though no fault of the Veterans Administration existed. He knew that a veteran was entitled to receive benefits for injury incurred on active duty without regard to fault, and he assumed the same rule applied to injury received while a patient in a government hospital. Plaintiff also testified that in his various letters and memoranda sent to the Veterans Administration which referred to "mistake" and "error," he meant the error in denying him disability benefits.

We have reviewed the extensive correspondence from the plaintiff and find that it is ambiguous and capable of the meaning attributed to it by the plaintiff. We observe, also, that plaintiff was cross-examined thoroughly by government counsel and was questioned sentence-by-sentence on many passages in the correspondence. The issue is one of fact. What the plaintiff intended to express in the correspondence and what he thought about the possibilities of malpractice were questions to be resolved by the trial judge. We may not reverse his findings unless they are clearly erroneous, *Tyminski v. United States,* 481 F.2d at 263; F.R.Civ.P. 52(a), and we do not find them to be so.

■ The plaintiff knew or should have known that neomycin was the direct cause of his hearing loss. He did not, however, know that the administration of the drug was medical negligence. Thus, he knew two of the essential elements of a possible cause of action—causation and damages—but he did not know, nor could he reasonably have been expected to know, according to the district court's findings, of the breach of duty on the part of the government. In these circumstances, the limitation period did not run until Dr. Soma's conversation suggested a duty had been breached by the Veterans Administration.

■ The administrative claim was filed by the plaintiff on January 13, 1973, well within the two-year period after the June 2, 1971 confrontation with Dr. Soma. The relevant statute, 28 U.S.C. § 2401(b), applies the two-year period to the filing of the administrative claim rather than the institution of suit. In this case, the suit was filed at an earlier date. We agree with the district court's conclusion that where the administrative claim is denied before any substantial progress has been made in the pending litigation, the suit need not be refiled to be effective. The government does not contend otherwise on this appeal. *Cf. Rosario v. United States,* 531 F.2d 1227 (3d Cir.) *cert. denied,* 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976). To hold that refiling was necessary would involve duplicitous pleadings and wasted effort.

We conclude, therefore, that the district court did not err in finding that the claim was timely filed.

### THE SET–OFF

■ On July 15, 1975, the Veterans Administration Board of Veteran's Appeals reversed itself and determined that the plaintiff was entitled to an increase in his disability rating as a result of the neomycin administration. Since that time, the plaintiff has been paid in excess of $50,000 in augmented disability benefits. The government contends that these payments should be set off against the judgment. The plaintiff asserts that the issue was not raised during the trial and, therefore, was waived. We do not accept that position. Government counsel discussed the issue during a pretrial conference, stating that set-off was compelled by statute.

Since the increase in benefits was compensation for the very same injury for which the judgment was awarded, the set-off should be allowed. 38 U.S.C. § 351 was amended in 1962 to provide that once a judgment is entered against the government in an action under the Federal Tort Claims Act for a disability which was also the subject of an award in pension benefits, no pension benefits shall be paid until the aggregate amount of augmented benefits payable equals the total amount of the judgment. The legislative history makes clear that Congress intended to prevent double payment for the same injury. 1962 U.S.Code Cong. & Admin.News, pp. 3260, 3268. For case law to the same effect, *see United States v. Brown,* 348 U.S. 110, 111, 75 S.Ct. 141, 99 L.Ed. 139 (1954); *Brooks v. United States,* 337 U.S. 49, 53–54, 69 S.Ct. 918, 93 L.Ed. 1200 (1949); *Steckler v. United States,* 549 F.2d 1372, 1379 (10th Cir. 1977). *See also* L. Jayson, Handling Federal Tort Claims § 159 (1977). The Veterans Administration has not been given any discretion to waive the statutory direction and it must be followed.

Because the augmented pension benefits have already been paid, it will be necessary to reduce the amount of the judgment by the amounts paid to the date the set-off is applied. Accordingly, the case will be remanded to the district court for this limited purpose. In all other respects, the judgment will be affirmed.