**Randy CHANCE et al., Plaintiffs,**

**v.**

**E. I. Du PONT De NEMOURS & COMPANY, INC., et al., Defendants.**

**No. 70–C–1107.**

United States District Court,
E. D. New York.

Jan. 23, 1974.

Jerome Edelman, Brooklyn, N. Y., for plaintiffs; Melvin Block, Brooklyn, N. Y., of counsel.

Townley, Updike, Carter & Rodgers, New York City, for defendant E. I. Du Pont De Nemours & Co.

Cravath, Swaine & Moore, New York City, for defendant Hercules Powder Co., Inc.

Rogers, Hoge & Hills, New York City, for defendant Atlas Chemical Industries, Inc.

Martin, Bloom, Lipton & Van De Walle, Great Neck, N. Y., for defendant Austin Powder Co.

Frank H. Gordon, New York City, for defendant Institute of Makers of Explosives.

Montfort, Healy, McGuire & Salley, Garden City, N. Y., for defendants American Cyanamid Co. and Olin Mathieson Chemical Corp.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

### I. FACTS AND PROCEEDINGS

These actions arise out of separate accidents scattered across the nation in which children were injured by blasting caps. Damages are sought from manufacturers and their trade association, the Institute of Makers of Explosives (IME). Plaintiffs' basic allegation is that the injuries were a proximate result of agreement by members of the explosives industry not to place any warning upon individual blasting caps. Federal jurisdiction is based on diversity of citizenship.

Eighteen separate actions were originally consolidated for discovery and other pretrial proceedings. As the result of motions previously considered, the claims of three groups of plaintiffs were severed. *See* Hall v. E. I. Du Pont De

Nemours & Co., Inc., 345 F.Supp. 353 (E.D.N.Y.1972); 312 F.Supp. 358 (E. D.N.Y.1970); Chance v. E. I. Du Pont De Nemours & Co., Inc., 57 F.R.D. 165 (E.D.N.Y.1972). Claims of thirteen children injured in twelve unrelated blasting cap accidents between 1955 and 1959 remain. The accidents occurred in the ten states of Alabama, California, Maryland, Montana, Nevada, North Carolina, Tennessee, Texas, Washington and West Virginia. Plaintiffs are citizens of the states in which their injuries occurred.

The corporate defendants in this case are one distributor (Austin Powder Co.) and five manufacturers of blasting caps who have comprised the bulk of this industry over the past fifty years. They are: E. I. Du Pont De Nemours & Co., Inc. ("Du Pont"), Hercules Powder Co. ("Hercules"), Atlas Powder Co. ("Atlas"), all citizens of and having their principal place of business in Delaware; American Cyanamid Co. ("Cyanamid"), a citizen of Maine, with its principal place of business in New Jersey; Olin Mathieson Chemical Corp. ("Olin"), a citizen of Virginia with its principal place of business in Connecticut; and Austin Powder Co. ("Austin"), a citizen of and having its principal place of business in Ohio. Also joined as a defendant is the industry trade association, IME, an unincorporated association with its principal place of business in New York. Each of the defendants conducts business in each of the states in which injuries occurred.

Defendants have moved for severance of the actions which remain consolidated on the ground of improper joinder, and for dismissal or transfer of the claims thus severed. Our earlier orders reserved decision on this question pending an evidentiary hearing on the question of which law should govern the substantive issues in this case. 345 F.Supp. 353, 380–381; 57 F.R.D. 165, 171.

■ As indicated below, the applicable law with respect to each of the substantive issues in these actions is not the law of New York. For this and oth-

er reasons these actions must be severed and transferred to the federal district court in the respective jurisdictions where the accidents occurred. 28 U.S.C. § 1404(a).

This court's determination of the choice-of-law questions in this case and related issues such as the extent of any defendant's presence in New York or elsewhere are binding only with respect to the questions of severance and transfer now before this court. They are not intended to be dispositive of the same issues when raised with respect to the merits or other issues. Chance v. E. I. Du Pont De Nemours & Co., Inc., 57 F. R.D. 165, 169–171 (E.D.N.Y.1972).

## II. EXTENT OF JOINT-INDUSTRY ACTIVITIES IN NEW YORK

Central to plaintiffs' invocation of New York law is the contention that significant activity took place in New York with respect to a joint-industry determination not to label individual caps. To establish the requisite nexus with New York State, plaintiffs must show that, either independent of, or through delegation to, IME, the blasting cap industry made a determination to refrain from labeling individual blasting caps and that the decision in some meaningful way, was focused in New York.

Analysis of the documents submitted to the court and the testimony of the witnesses who appeared at the choice-of-law hearing supports the conclusion that a joint-industry decision to refrain from labeling individual caps was in fact formulated. We turn our attention, therefore, to the issue of the locus of decision.

With respect to an industry-wide policy formulation *independent of IME*, no evidence has been presented to lead to a determination of a New York nexus. Plaintiffs' case must therefore rest on proof of their allegation that in various instances from 1927 to 1962 IME was the focal point of a New York-based industry effort to avoid the labeling of individual blasting caps. The evidence does not support that conclusion. What

joint action there was through IME took place on a national basis.

IME was founded in 1913 to further the general welfare of the industry and to promote safety in the transportation, storage, use and handling of explosives. This association has maintained its office in New York City since 1913. The office is run by the Secretary-Treasurer, an officer elected annually by the IME Executive Committee. Four full-time and one part-time employees assist him in running the New York City office. In addition, IME retains the services of an explosives safety consultant who works out of Wilmington, Delaware.

IME funds and records are kept in a New York bank. Dues are computed on the basis of members' pro rata share of total industry sales and the Secretary-Treasurer is empowered to sign all checks.

What industry-wide decision making authority IME possesses is lodged in the Institute's standing committees composed of representatives of the individual manufacturers. Most of the meetings of these committees take place outside of New York.

Of the standing committees, the Public Relations Committee is the group most often meeting in New York and making the most significant use of the New York office's facilities. This committee is charged with the development of the blasting cap safety education program. The content of this program has evolved from news releases, radio spots and selective mailings, to mass mailings to public and private schools, TV spots and paid ads appearing in magazines. The bulk of the New York activity consisted of distributing these educational materials to all parts of the country. IME conducts a substantial educational campaign in each of the ten states where an accident occurred. These activities have been conducted continuously for at least the past thirty years.

Plaintiffs place special reliance on the minutes of the May 12, 1927 meeting of the IME Standardization Committee which they claim demonstrates an industry-wide determination not to label individual caps. A subcommittee had been designated in New York for the purpose of determining what 'sort of warning should be placed as case inserts in boxes of blasting caps. It worked at Wilmington and submitted its report to the Standardization Committee in Cincinnati in May 1927. This report contained recommendations for printed insert materials and suggested the labeling of boxes and cartons with cautionary warnings and the enclosure of suggestions for safe usage. The minutes of the Cincinnati meeting reflect a finding that marking each cap was not practical and a recommendation that it should not be attempted. It read in part:

> The Committee decided that it is impractical to mark each individual cap or detonator or other device and recommended that no attempt be made to mark each one.

The report was "approved" at Atlantic City, New Jersey in June 1927.

Even were we to assume that this excerpt reflected an industry-wide determination, New York was not, in any meaningful way, the locus for this decision. Neither the work of this committee, nor its report, nor approval of the report had any significant connection with New York. Wilmington, Cincinnati, or Atlantic City was more clearly the location of decision.

Plaintiffs also rely on the lobbying activities of IME with respect to proposed legislation on labeling in the mid-1950's. In May 1954, Representative Clifford Young of Nevada introduced in the 83rd Congress, Second Session, a bill to amend the Flammable Fabrics Act so as to prohibit the introduction or movement in interstate commerce of blasting caps unless stamped or labeled to indicate that they are dangerous (H.R.9049, re-introduced in the 84th Congress as H. R.3721). The bill was referred to the House Committee on Interstate and Foreign Commerce.

The initial industry response was made by representatives of Hercules alone whose instructions came from company headquarters in Delaware. They called on Congressman Young at his Washington office and argued, generally, that labeling of individual caps would be counterproductive since it might create an attractive nuisance.

The Hercules spokesmen apprised Mr. Young of the extensive blasting cap safety program. Congressman Young then requested an estimate of the cost involved in commencement and operation of an individual cap labeling program.

In November 1954 representatives of the Wilmington members of IME met in Delaware and discussed the matter of presentation of the requested cost estimates. In December, a Hercules executive, a member of the IME Technical Committee, wrote from Delaware to the IME Secretary-Treasurer, in New York, asking that he organize the compilation of the type of cost data requested by Congressman Young. This was done through IME to avoid disclosure of any company's cost estimates to any other company.

The Secretary-Treasurer then circulated a letter to the members of the industry asking them to submit to him their individual estimates of the cost data. From these estimates, computed by engineers and others outside of New York, he compiled in New York a composite figure.

The matter came before IME, as a body, at the January 1955 meetings of the Technical and Executive Committees at the Waldorf Astoria in New York. An industry delegation was appointed to call upon Congressman Young in Washington, D. C., in March of 1955. At this meeting Mr. Young requested and was furnished the cost data which the New York office had compiled and he apparently decided not to press his bill.

The evidence demonstrates that the members of the industry determined at the January Executive Committee meeting in New York to take a concerted stance with respect to Congressman Young's proposed legislation. In this instance, the industry did delegate some of its decision-making authority to IME and the formulation of policy did take place in New York.

This finding must be viewed in the perspective of the other evidence in this case. Significantly, that evidence points to no other instance in the fifty year existence of IME where industry-wide policy formulation with respect to blasting cap labeling took place in New York. If such policies were formulated by IME over these years, they were made in locales across the country.

In any event, the evidence is consistent with a conclusion that what industry-wide policy-making took place was formulated through communications between the manufacturers independent of IME—communications by phone, by mail, and by conferences at the locales of the individual manufacturer. Plaintiffs' claim of a significant New York nexus for industry-wide policy-making must fall for failure of proof.

## III. SELECTING THE APPLICABLE LAW

New York principles of choice-of-law must govern this court's determination of the applicable substantive law. Klaxon v. Stentor Electric Manufacturing Company, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

In the torts field New York has abandoned the traditional rule (embodied in the original Restatement of Conflict of Laws, § 334), requiring application of the law of the state of the tort with respect to every issue in dispute in the case. *See, e. g.,* Poplar v. Bourjois, Inc., 298 N.Y. 62, 66, 80 N.E.2d 334, 335, 336 (1948). As advances were made in the technology of transportation, and interstate commerce and travel increased, the frequency of accidents occurring in states having little relation to the parties involved grew. The traditional approach's focus on the often fortuitous state of accident led to increasingly unsatisfactory results. *See, e. g.,* Kilberg

v. Northeast Airlines, Inc., 9 N.Y.2d 34, 211 N.Y.S.2d 133, 172 N.E.2d 526 (1961) (in action by New York decedent's estate arising out of crash in Massachusetts of flight originating in New York, court refused to apply Massachusetts wrongful death limitation); Reese and Rosenberg, Cases on Conflict of Laws 466–536 (6th ed. 1971).

Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963) marked the beginning of a new era in choice-of-law analysis in the tort area. The setting for *Babcock* was a car accident in Ontario where a New York driver lost control of his car, injuring his passenger, also a New York resident. The lower court, applying the law of the place of the tort, ruled the action precluded by Ontario's guest statute. The Court of Appeals reversed. Noting the "unjust and anomalous results which may ensue from application of the traditional rule in tort cases" 12 N.Y.2d at 479, 240 N.Y.S.2d at 747, 191 N.E.2d at 282, the Court adopted an approach giving "controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." 12 N.Y.2d at 482, 240 N.Y.S. at 749, 191 N.E.2d at 283. It refused to apply the Ontario statute, ruling that New York's paramount policy of requiring compensation by tort-feasors dictated application of New York law. This same "grouping of contacts" or "center of gravity" approach had previously been adopted by the Court of Appeals in the contracts area of choice-of-law. *See* Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99 (1954).

Basic to the court's analysis in *Babcock* was a recognition that despite the certainty of the traditional rule, its application ignored the often substantial interests in the resolution of particular issues in a state other than the one where the tort occurred. 12 N.Y.2d at 478, 240 N.Y.S.2d at 746, 191 N.E.2d at 281. Beyond this was the court's recognition that there was "no reason why all issues arising out of a tort claim must be resolved by reference to the law of the same jurisdiction." 12 N.Y.2d at 484, 240 N.Y.S.2d at 752, 191 N.E.2d at 285.

The New York approach—focusing on selection of the law most intimately concerned with the outcome of each particular issue—has been basically that adopted by the Restatement, Second, Conflict of Laws. *See, esp.,* §§ 6, 145. Following *Babcock* these principles have been developed in New York through a series of cases involving, primarily, the issues of liability under guest statutes (*see, e. g.,* Dym v. Gordon, 16 N.Y.2d 120, 262 N.Y.S.2d 463, 209 N.E.2d 792 (1965); Macey v. Rozbicki, 18 N.Y.2d 289, 274 N.Y.S.2d 591, 221 N.E.2d 380 (1966); Tooker v. Lopez, 24 N.Y.2d 569, 301 N.Y.S.2d 519, 249 N.E.2d 394 (1969)), as well as a number of cases involving wrongful death actions. *See, e. g.,* Long v. Pan American World Airways, Inc., 16 N.Y.2d 337, 266 N.Y.S.2d 513, 213 N.E.2d 796 (1965); Miller v. Miller, 22 N.Y.2d 12, 290 N.Y.S.2d 734, 237 N.E.2d 877 (1968). Because of the frequency with which the New York Court of Appeals was confronted with the issues in the guest statute area, it was soon able to articulate detailed guiding rules. *See* Tooker v. Lopez, *supra,* 24 N.Y.2d at 585–586, 301 N.Y.S.2d at 532–533, 249 N.E.2d at 403–404 (1969) (Fuld, C. J., concurring). In the most recent of these cases, Neumeier v. Kuehner, 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972), Chief Judge Fuld—the leader in this modern development—was able to resolve the conflicts situation presented with relative ease on the basis of fully developed guidelines.

Nevertheless, outside the guest statute area, New York choice-of-law principles remain largely to be developed—through application to remaining areas of tort law of the broad principles laid down in *Auten* and *Babcock*, as well as those embodied in Restatement, Second. *See, e. g.,* Rosenthal v. Warren, 475 F.2d 438 (2d Cir. 1973), cert. denied, 414 U.S. 856, 94 S.Ct. 159, 38 L.Ed.2d 106 (1973)

(in a wrongful death action where a New York resident died eight days after an operation in a Massachusetts hospital, *Babcock* line applied to determine the applicable law on the issue of limitations on liability). We are cautioned by the entire thrust of modern developments in this field that the choice-of-law solutions adopted in one field of tort law should not too readily be taken as applicable in another. Thus, the specific resolution of conflicts problems by the New York courts in the guest statute cases, while helpful in suggesting a general approach, provides little assistance in resolving the choice-of-law issues raised in the present case. The law of which jurisdiction shall apply with respect to the questions of joint liability presented in this action appears to be one of first impression in this state.

There is good reason to conclude that the New York courts would find the issues of standard of liability and limitations on liability to be governed by the law of the jurisdiction where the accident occurred. Such a jurisdiction appears to have an interest even greater than that of the manufacturing state or the state where the manufacturer made its managerial decisions in having its law applied to these individual issues because of the need to protect children in the community against serious injury. Even here the matter is not entirely clear since the two latter jurisdictions have an interest in the law's not being so stringent as to make production of caps impossible, thereby causing a loss of jobs and wealth.

Resolution of which law should govern the issue of joint liability is even less obvious. We conclude, however, for the reasons which follow, that a New York court would not apply New York law to this issue.

*New York's interest in applying its own law to the issue of joint liability.* Organizations may choose New York as the focus of their activities for a variety of financial, political, social or legal considerations, among others. Once these organizations choose to oper-

ate within New York's borders, and their activities in New York give rise to legal obligations, New York has a continuing strong interest in the regulation of their activities. There would be little question, for example, of the legitimacy of New York's interest in regulating physical acts of a tortious nature by such organizations—even where the consequence of such tortious acts are felt outside the state. When decisions of a tortious nature to act—or to refrain from acting—are formulated in New York, this state's interest in the regulation of these decisions is equally legitimate. The "intangible" nature of such tortious acts cannot deprive the state where the act took place of its inherent interest in regulating that conduct. A state has some interest in developing substantive laws insuring that it is not turned into a den of iniquity from which wrongdoers sally forth to do mischief in the land.

With respect to the issue of joint-industry liability, our earlier opinion demonstrated that New York has manifested its concern in providing recovery through imposition of joint liability in a variety of factual situations. Hall v. E. I. Du Pont De Nemours & Co., Inc., 345 F.Supp. 353, 370–380 (E.D.N.Y.1972). But any interest of New York in the issue of joint liability in these actions must be predicated on a showing that tortious decisions substantially connected with the harm actually did take place in New York.

As shown above, the decisions to act —if tortious at all—were not to any significant extent concentrated in New York State; rather, they were made across the nation. Although what formulation of policy did take place in New York would probably be sufficient to meet minimum constitutional standards for application of New York law under Home Ins. Co. v. Dick, 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926 (1930), these connections are so tenuous as to require a conclusion that a New York court would not choose to apply its own law were there any competing jurisdiction

with a legitimate interest in seeing its law applied.

*Interest of the states where the accidents occurred.* The states where the accidents occurred (in each case the state of the respective plaintiff's residence) have a substantial interest in the question of "joint liability" in this case. This is equally true of those states which have rules precluding joint liability and of those which would impose joint liability under these circumstances. The nature of this interest revolves about each state's policy determination in choosing to give priority to compensation of those injured within the state or, alternatively, in choosing to place greater weight on encouraging commerce in the state.

*Interest of the States of Manufacture.* In an appropriate case the interest of the states of manufacture of the caps or the principal place of business of the manufacturer might be considered substantial in resolution of such issues as standard of liability and joint-industry liability. In these actions, however, because the maker of the cap involved in each accident is unknown, it is impossible to utilize a rule looking to state of manufacture.

Conceivably, these states where the accident occurred might conclude that the state of most likely manufacture or the state where the bulk of the industry is managed, should provide the controlling law. But, if so, the state of accident can better make that decision than we can.

Should the state of accident (X) determine that its own law of conflicts requires it to apply the law of another state—presumably the place of manufacture (Y), if known, or the place of the manufacturer's main place of business (Z)—then the forum state's (F's) approach to renvoi becomes significant. *See, e. g.,* R. A. Leflar, American Conflicts Law § 7 (2d ed. 1968); W. L. M. Reese and M. Rosenberg, Cases on Conflict of Law 63–64, 505–506, 549 (6th ed. 1971); Restatement of Law, Second, § 8. New York's law is far from crystal clear on the matter, but it appears to be characterized by the pragmatism in which theory yields somewhat, in the words of the Restatement, Second, "to considerations of practicability and feasibility." *Id.* § 8(2).

For example, in In re Schneider's Estate, 198 Misc. 1017, 96 N.Y.S.2d 652 (Sur.Ct.), *aff'd on rearg.,* 100 N.Y.S.2d 371 (Sur.Ct.1950) where F pointed to X, and X pointed back to F, New York avoided the potential of a perpetual impasse by applying the entire law of X and finding that X would in turn apply F's local law. Similarly, where X's rule of conflicts aimed not back to F, but to Y, New York would apparently apply all of X's law, including its rules of conflicts and utilize Y's substantive law. *Cf.* Wyatt v. Fulrath, 16 N.Y.2d 169, 264 N.Y.S.2d 233, 211 N.E.2d 637 (1965) (to solve an estates problem New York looked to England, which in turn would have applied Spanish Law; renvoi not mentioned); Herzog, [New York] Conflicts of Laws, 18 Syracuse L.Rev. 157, 168, n. 74 (1966) (interpreting *Wyatt* as representing New York's view; "court used the renvoi doctrine directly").

More recently, New York seems to have been absorbing renvoi considerations into its interest analysis. Thus, the fact that X would not apply its own law is but one factor to be considered in determining whether it is F's, X's or Y's substantive law that should apply.

Some insight into the New York approach may be gleaned from the decision in Long v. Pan American World Airways, 16 N.Y.2d 337, 266 N.Y.S.2d 513, 213 N.E.2d 796 (1965). This case, growing out of a plane crash in Maryland, involved the issue of whether a wrongful death claim could be brought by the surviving relatives of two Pennsylvania victims. In determining whether Maryland or Pennsylvania law applied, the Court of Appeals, finding Pennsylvania's interest in the issues to be paramount, focused solely on Pennsylvania's local law and did not mention that state's conflicts approach even though Pennsylvania's highest court had spoken

on this question just the year before in Griffith v. United Air Lines, 416 Pa. 1, 203 A.2d 796 (1964) (applying interest analysis to give effect to Pennsylvania survival statute). The failure of the New York Court of Appeals to mention renvoi suggests a reluctance to superimpose any mechanical renvoi doctrine upon an interest analysis. *Long* is particularly significant because it was written by Chief Judge Fuld.

As illustrated by the recent decision in Tyminski v. United States, 481 F.2d 257, 268 (3d Cir. 1973), the "governmental interest analysis in determining choice of law issues," should, if applied consistently, result in an agreement by all jurisdictions on the substantive law to be applied without regard to renvoi or the happenstance of which jurisdiction is the forum. Viewed in the light of *Tyminski* and *Long, Wyatt* is not, as Professor Herzog suggested, a renvoi case, but one reflecting a center of gravity approach.

No claim is made that any of the caps were manufactured in New York or that any significant managerial decisions were made here. Thus, under neither the doctrine of renvoi nor the interest approach would New York law apply.

*Other factors in choice-of-law.* Section 6(2) of Restatement, Second, Conflict of Laws sets out seven factors to guide choice of the applicable rule of law:

   (a) the needs of the interstate and international systems,

   (b) the relevant policies of the forum,

   (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

   (d) the protection of justified expectations,

   (e) the basic policies underlying the particular field of law,

   (f) certainty, predictability and uniformity of result, and

   (g) ease in the determination and application of the law to be applied.

These criteria are of only limited value in the fact situation presented by these actions. We have considered in this and prior opinions factors (b), (c), and (e), the interests and basic policies of the respective jurisdictions in the determination of the specific substantive issue and none point to New York. Criteria (a) and (g), "ease in the determination and application of the law to be applied" and "the needs of the interstate and international systems," while important factors in this case with respect to the question of appropriate forum, have only an indirect bearing on the specific choice-of-law issue here.

Considerations (d) and (f), "certainty, predictability and uniformity of result" and "protection of justified expectations" find more meaningful application with respect to other substantive issues or in other substantive fields—for example, issues of which law will govern execution of a contract or a will. They do not help with respect to joint liability, at least looking at the matter from the point of view of the person injured. The behavior of the children or their parents was not based upon reliance on the state law which would govern the question of joint liability. Nor could members of IME have been much influenced in choosing their place of meeting by which law on joint liability would regulate their decisions. That specific issue has not received sufficient attention from the states involved to allow any meaningful determination of what that law actually is in the respective jurisdictions. Choice of one jurisdiction's law on grounds of predictability or certainty makes little sense when the law of the respective jurisdictions with respect to a particular issue has yet to be established.

Professor Leflar has suggested five general choice-of-law principles to guide choice of the applicable substantive law. R. A. Leflar, American Conflicts Law 245 (2d ed. 1968). The first four factors substantially echo those of Restatement Second, while Professor Leflar's

**448**

fifth factor is not reflected in the Restatement:

(a) Predictability of results;

(b) Maintenance of interstate and international order;

(c) Simplification of the judicial task;

(d) Advancement of the forum's governmental interests;

(e) Application of the better rule of law.

Professor Leflar's final factor has received some approval by New York courts. *See* Pahmer v. Hertz Corporation, 36 A.D.2d 252, 319 N.Y.S.2d 949, 956 (2d Dep't 1971), *aff'd*, 32 N.Y.2d 119, 343 N.Y.S.2d 341, 296 N.E.2d 243 (1973) (court characterized the California guest statute which would have barred recovery to a New York domiciliary as a "retrograde approach" and selected the New York rule). *See also, e. g.*, Juenger, Torts Choice of Law in Michigan, 52 Mich.St.Bar J. 730, 733 (1973) ("Minnesota, New Hampshire, Rhode Island, Vermont and, apparently, Mississippi . . . tend to accord greater weight to the better rule," citing cases). *Cf.* Schein v. Chasen, 478 F.2d 817, 821 (2d Cir.), *pet'n for cert. granted sub nom.*, Lehman Bros. v. Schein, 414 U.S. 1062, 94 S.Ct. 568, 38 L.Ed.2d 467 (1973) (to the extent that the decision is explicable, it may be considered a "better rule" case). Yet focus on "the better rule" can serve little purpose where the respective jurisdictions generally have not yet made determinative judgments as to what their law is on this substantive issue. This court cannot say, for example, that the New York rule on joint liability—itself largely undefined—is preferable to the rule one of the other jurisdictions may subsequently decide upon.

The interest of the state of accident in application of its own law to the issue of joint liability is not as substantial as its interest in such issues as that of limitation on liability—where the fact that the plaintiff resides in the state is virtually controlling—or that of

standard of liability—where the state of accident has a significant interest. As a result, had New York been shown to be the locale of significant industry-wide policy formulation not to label, this court would be inclined to find New York's interest sufficiently substantial to apply that state's law with respect to joint liability.

The fact is, however, that to the extent that the blasting cap industry operates in unison on safety matters it does so on a national basis. Modern choice-of-law analysis is inadequate to determine a single determinative state law under these conditions. The concern with which law shall govern decision of issues is in truth one shared by every state. Meaningful uniform regulation of such a national concern can only be achieved through uniform state legislation or through Congressional action, not through the law of conflicts.

■ In such situations it might well be most appropriate to resort to some federal torts standard. But in the absence of Congressional action in this field at the times in question it would be inappropriate to turn back—even in this limited area, and even if the Constitution permitted—to pre-*Erie* jurisprudence through application of a federal judicially imposed rule. *Cf.* Cavers, The Choice-of-Law Process 245–249 (1965); C. A. Wright, Law of Federal Courts § 60 (2d ed. 1970).

We are satisfied that on the basis of the limited contacts with New York State, New York would not apply its own law on the question of joint liability, but would look to the law of the state where each accident occurred.

## IV. APPROPRIATE FORUM

■ Courts try to respect a plaintiff's choice of forum. But in considering a motion for a section 1404(a) transfer that choice is just one factor among others—and not one to be given disproportionate weight. *See, e. g.*, Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc., 267 F.Supp. 938 (S.D.N.Y.

1967); Schneider v. Sears, 265 F.Supp. 257 (S.D.N.Y.1967). In this case, compelling interests suggest that we sever these actions and transfer them to the districts where the accidents occurred:

(1) A significant factor dictating retention of these actions in New York would have been the economies inherent in the consolidation of thirteen actions into one trial. Our finding that New York law does not govern any of the substantive issues in this case indicates that the actions should be severed. Although some questions of fact still remain common to each of these actions, with no common legal standards involved no jury could be expected to keep straight the separate series of legal standards to be applied to each of the accident victims. These actions could no longer be tried in one consolidated action. Whatever economies from consolidated discovery could be achieved have already been obtained.

(2). Were these actions retained in New York, this court would be required to research and determine the law of each of the states of accident with respect to each of the issues in this case. Beyond the logistical impracticability of one court's assuming such a burden, it is apparent—especially in this "frontier" area of tort law where local precedents are few—that the transferee courts would be more familiar with their own state law, more adept at researching and applying it, and better suited to make the requisite policy determinations involved in resolving issues of first impression. Bernhardt v. Polygraphic Company of America, 350 U.S. 198, 204–205, 76 S.Ct. 273, 277, 100 L.Ed. 199 (1956) ("Since the federal judge making those findings is from the Vermont bar, we give special weight to his statement of what Vermont law is"); Lomartira v. American Automobile Insurance Co., 371 F.2d 550, 554 (2d Cir. 1967).

(3) Each of these actions involves, in some combination, investigation by local law enforcement officials, description of the accident by local witnesses, treatment of the victim by local doctors, and records and evaluations of the injuries contained in local hospitals. The wholesale dislocations in producing these witnesses and records in New York should not be countenanced without strong justification.

Beyond this, a joint resolution of these claims is most likely to be achieved by subjecting them to the critical scrutiny of local jurors with knowledge of local practice, rather than through the judgment of a fact-finding body located hundreds or thousands of mile away in an entirely different environment. *See, e. g.,* Pereza v. Mark, 423 F.2d 149, 151 (2d Cir. 1970) (lending a loaded gun without telling the borrower it is loaded; Vermont jurors "are very likely better acquainted with rifles than we are"); Tennessee Gas Transmission Co. v. Hall, 277 S.W.2d 733 (Tex.Civ.App.1955) ("in the jurisdiction of the trial court subsoiling or chiseling operations . . . were matters of common knowledge"); Broeder, The Impact of the Vicinage Requirement: An Empirical Look, 45 Neb.L.Rev. 99 (1966); Levin & Levy, Persuading the Jury with Facts Not in Evidence: The Fiction-Science Spectrum, 105 U.Pa.L.Rev. 139 (1969). For example, according to the newspaper article reporting the accident to plaintiffs Eugene Mullens and Jerry Collins in 1957, the boys were injured while "playing with a cap brought out of the mines by a worker." West Virginia News, September 26, 1957. The federal court sitting in West Virginia, with a West Virginia jury, is best equipped to decide whether blasting caps are familiar articles around coal mines. Community standards are a vital element in assessing the actions of the parties in this suit.

(4) A final consideration which we give no little weight to, is our judgment that were these actions brought in a New York State court, it would refuse to entertain the actions under New York's liberalized doctrine of *forum non conveniens.* See Rule 327, NYCPLR;

Silver v. Great American Insurance Company, 29 N.Y.2d 356, 361, 328 N.Y. S.2d 398, 402, 278 N.E.2d 619, 622 (1972) (*"forum non conveniens* relief should be granted when it plainly appears that New York is an inconvenient forum and that another is available that will best serve the ends of justice and the convenience of the parties"). Although we are not constitutionally compelled to apply New York's rules of *forum non conveniens* (Willis v. Weil Pump Company, 222 F.2d 261 (2d Cir. 1955); *see, generally,* 1A Moore's Federal Practice ¶ 0.317 [2]), respect of federal courts for state courts sitting in the same jurisdiction—and concern for the dangers of forum shopping—counsel that we give due weight to the likely disposition of this matter in this state's courts.

## V. PLACE WHERE SUIT MIGHT HAVE BEEN BROUGHT

A district court may transfer any civil action to another federal district "for the convenience of parties and witnesses in the interest of justice." 28 U.S.C. § 1404(a). Transfer is restricted to a district where the action "might have been brought" originally. In this circuit this language has been interpreted to mean a forum where both venue would have been proper and the defendant would have been amenable to process. Foster-Milburn Co. v. Knight, 181 F.2d 949 (2d Cir. 1950). Consent of the defendants to venue or jurisdiction in the transferee district could not waive the defect. Hoffman v. Blaski, 363 U.S. 335, 80 S. Ct. 1084, 4 L.Ed.2d 1254 (1960).

In the present actions, venue is appropriately laid in the respective states of accidents. *See* 28 U.S.C. § 1391(a). We also find that the defendants, including IME, are amenable to service in each of the transferee states.

In September, 1970, when this action was commenced, all the manufacturer defendants were qualified to do business in each of the ten states in which the thirteen individual plaintiffs resided. Each plaintiff might have brought his claim against those defendants in his home state.

■ The Austin Powder Company (which sold but did not manufacture blasting caps) is qualified in six of those ten states. In each of the states in which Austin was not authorized to do business in 1970—California, Maryland, Montana, Nevada and Washington—the long arm statutes effective in those states might have been invoked for the service of process without the state. Any success Austin might have had in demonstrating its total absence from a given state thereby defeating service under a long arm statute would not prevent the transfer of these claims. *See* Code of Alabama, Title 7, § 199(1); California Code of Civil Procedure § 410.10; Annotated Code of Maryland, Article 75, § 96(a)(1)(4); Revised Code of Montana, § 93–2701, Rule 4B(1)(a), (b); Nevada Revised Statutes, § 14.080; General Statutes of North Carolina, § 1–75.4(3), (4); Tennessee Code Annotated, § 20–235(a)(b); Vernon's Texas Civil Statutes, Article 2031b(4); Revised Code of Washington Annotated, § 4.28.-185(1)(a), (b); West Virginia Code of 1961, § 31–1–71. *Cf., e. g.,* Gray v. American Radiator and Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961); Golden Gate Hop Ranch v. Velsicol Chem. Corp., 66 Wash.2d 469, 403 P.2d 351 (1965).

■ IME was doing business in each of the ten states in which an accident occurred. *See* International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). To the extent that an association is amenable to suit at all, it should be subject to service both under traditional concepts of doing business as well as under long arm statutes. The same rules governing corporations may be applied to other forms of business which transact or do business within a state. *See* Note, Developments in the Law—Judicial Control of Actions of Private Associations, 76 Harv.L.Rev.

983, 1083 (1963). *Cf.* Denver & R. G. W. R. Co. v. Brotherhood of R. Trainmen, 387 U.S. 556, 562, 87 S.Ct. 1746, 1750, 18 L.Ed.2d 954 (1967) ("reality of the multi-state, unincorporated association . . . permit suit against that entity, like the analogous corporate entity, wherever it is 'doing business'"); Sperry Products v. Association of American R. R., 132 F.2d 408, 411 (2d Cir. 1942), *cert. denied,* 319 U.S. 744, 63 S. Ct. 1031, 87 L.Ed. 1700 (1943) ("Since, . . . for the purpose of suit [the law] has come to regard them as jural entities, we can see no reason why that doctrine should not be applied consistently to other procedural incidents than service of process [such as] venue"); Jersey Farms Milk Serv., Inc. v. Amalgamated Meat C. & B. W., 297 F.Supp. 1098, 1101–1102 (D.C.M.D.Tenn.1969); Krause v. Hauser, 272 F.Supp. 549 (E. D.N.Y.1967) (long arm jurisdiction asserted over partnership); R & E Dental Supply Co. v. Ritter Co., 185 F.Supp. 812 (S.D.N.Y.1960) (venue in state where defendant is "found" in action against an unincorporated trade association); Western Mut. Fire Ins. Co. v. Lamson Bros. & Co., 42 F.Supp. 1007, 1012 (D.C.S.D.Iowa 1941); Gross v. Gross, 28 Misc.2d 375, 211 N.Y.S.2d 279 (Sup.Ct.N.Y.Co.1961); 3A Moore's Federal Practice ¶ 17.25; Bater, Mishkin, Shapiro and Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 1092–1093 (2d ed. 1973); Ehrenzweig and Louisell, Jurisdiction in a Nutshell § 28–5 (3d ed. 1973); Isaacs, Amenability of Unions to Service of Process, 32 N.Y.S. Bar Bull. 24 (1960).

The comments to section 1.02 of the Uniform Interstate and International Procedure Act, for example, indicate that that act permits jurisdiction to be "exercised over an unincorporated association which maintains its principal place of business in the state." *See also* Restatement, Second, Conflict of Laws §

40(1) (1971) (exercise of judicial jurisdiction over partnership or unincorporated associations to be tested by same standards as exercise of jurisdiction over individual); American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts 115 (1968) ("sound reason for giving partnerships and other unincorporated associations the fictional treatment long accorded to corporations").

## VI. CONCLUSION

Under the doctrine of Van Dusen v. Barrack, 376 U.S. 612, 639, 84 S. Ct. 805, 821, 11 L.Ed.2d 945 (1964), where the transfer was on motion of the defendant, the transferee court must apply the law that would have been applied in the transferor court. With respect to the actions now before us, this means that each transferee jurisdiction will be compelled to apply New York conflicts law which, at least under our analysis, leads to application of the transferee jurisdiction's law.

Since transfer to another federal district is available we consider it inappropriate to consider the more drastic action of dismissal on *forum non conveniens* grounds. *See* Norwood v. Kirkpatrick, 349 U.S. 29, 75 S.Ct. 544, 99 L. Ed. 789 (1955); Headrick v. Atchison T. & S. F. R. R. Co., 182 F.2d 305, 308 (10th Cir. 1950); 1 Moore's Federal Practice ¶ 0.145 [6.–1] ("where another federal district court is the more convenient forum, the power to dismiss because of *forum non conveniens* grounds no longer exists; and if action is to be taken, it is limited to transfer").

We, therefore, sever the actions in this case and transfer each action to the respective federal court sitting in the district where each accident occurred.

So ordered.